AIR LINE PILOTS ASSOCIATION, INTERNATIONAL, Plaintiff,

v.

EASTERN AIR LINES, INC., Defendant.

INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS, AFL–CIO, et al., Plaintiffs,

v.

EASTERN AIR LINES, INC., et al., Defendants.

TRANSPORT WORKERS UNION OF AMERICA, AFL–CIO, et al., Plaintiffs,

v.

EASTERN AIR LINES, INC., Defendant.

and

Trump Shuttle, Inc., Intervenor.

Civ. A. Nos. 87–2002, 88–0870 and 88–0364.

United States District Court, District of Columbia.

Dec. 19, 1988.

866

James L. Linsey, Cohen, Weiss & Simon, New York City, Jonathan A. Cohen, Air Lines Pilots Ass'n, Intern., Washington, D.C., for Air Line Pilots Ass'n, Intern.

Joseph Guerrieri, Jr., Samuel Issacharoff, Richard Ruda, Guerrieri, Edmond & James, Washington, D.C., for Intern. Ass'n of Machinists and Aerospace Workers.

Victor Rabinowitz, Rabinowitz, Boudin, Standard, Krinsky & Lieberman, P.C., New York City, Anthony Bisceglie, Bisceglie & Walsh, Washington, D.C., for Local 553, Transport Workers Union of America.

John J. Gallagher, Michael J. Madigan, Joel Cohn, Akin, Gump, Strauss, Hauer & Feld, Washington, D.C., David Boies, Cravath, Swaine & Moore, New York City, for Eastern Air Lines, Inc.

Donald L. Flexner, Thomas P. Gies, Diana Frances, Crowell & Moring, Washington, D.C., for intervenor Trump Shuttle, Inc.

## MEMORANDUM OPINION

BARRINGTON D. PARKER, Senior District Judge:

In separate verified complaints alleging violations of the Railway Labor Act ("RLA" or "Act"), 45 U.S.C. §§ 151 et seq. (1987), the Air Line Pilots Association, International ("ALPA"), the International Machinists & Aerospace Workers ("IAM") and Local 553 Transport Workers Union of America ("TWU") have sued Eastern Air Lines, Inc. ("Eastern") and request both injunctive and declaratory relief. In a joint motion for a preliminary injunction, filed on November 18, 1988, the three unions seek to halt the proposed sale of Eastern's Air Shuttle ("Shuttle") operations to Trump Shuttle, Inc. ("Trump Shuttle" or "Trump").[1] They claim that Eastern's proposed sale of the Shuttle to Trump violates both Eastern's status quo and collective bargaining obligations under the RLA, triggers a "major dispute" under the RLA because the proposed action was not based on any express or arguable contractual right or consistent past practice, and was undertaken with the express intent of undermining the unions and violates the statutory obligation to refrain from interfering with certified bargaining representatives.

The motion was fully presented and contested by able counsel for the parties. The memoranda of points and authorities and the arguments of counsel have been considered. For the reasons stated below the Court determines that the sale of the Shuttle should not be halted. Accordingly, plaintiffs' motion for a preliminary injunction is denied. The Court's required findings of fact and conclusions of law are presented in the discussion which follows.

## I. FACTUAL FINDINGS

Plaintiffs serve as the certified collective bargaining representatives of Eastern's employees. ALPA is the representative for Eastern's pilots. The ALPA–Eastern collective bargaining agreement expired on July 1, 1988, and the parties are currently engaged in contract negotiations. 45 U.S.C. § 156.

The IAM is the representative for Eastern's mechanics, baggage handlers, and other ground service personnel. The most recent IAM–Eastern agreement expired on December 31, 1987. Contract negotiations were started in October 1987, and for more than a year, the two have been engaged in negotiations for a new agreement before

1. On December 9, 1988, an order was entered allowing Trump Shuttle, Inc. to intervene. Rule 24(b)(2) Fed.R.Civ.P.

the National Mediation Board. 45 U.S.C. § 155, First. ALPA and the IAM have been parties to successive collective bargaining agreements for more than 40 years.

Local 553 of TWU is the bargaining representative for Eastern's flight attendants. The Local and Eastern's management have had successive collective bargaining agreements for many years. Their current agreement remains in effect through this month. They exchanged formal notices of their intent to renegotiate the entire agreement in October 1988. 45 U.S.C. § 156.

### A.

Eastern is the nation's sixth largest air carrier and a wholly-owned subsidiary of the Texas Air Corporation ("Texas Air"). It provides scheduled passenger and cargo service out of hubs located in Atlanta, Miami, Philadelphia, and San Juan, Puerto Rico. It also operates passenger and other services extending through Central and South America.

Eastern operates a shuttle service, on an hourly basis, between LaGuardia Airport, New York City, and both Logan Airport, Boston, and National Airport, Washington, D.C. The Shuttle has operated for more than 25 years and is a well-established and profitable division of Eastern Air Lines. It provides employment for approximately 700 full-time employees, including 200 pilots, 146 machinists and approximately 250 flight attendants. It has no single permanent group of employees, rather, Eastern's workers bid for positions on basis of seniority. An employee's assignment to the Shuttle on a month-to-month basis depends upon the bids of more senior employees.

The Shuttle division employs 2.3% of Eastern's 30,500 employees, utilizes 6.7% of the company's 255 aircraft, accounts for approximately 1.5% of the company's total available seat miles ("ASM's"), and generates approximately 4.3% of the total operating revenue. The division accounts for approximately 2.9% of Eastern's total assets at net book value, and approximately 7% of its assets at fair market value.

The Shuttle's traffic is virtually limited to passengers who travel only between the three named cities. The passengers do not continue to other Eastern destinations. In recent years the Shuttle's market share has declined, primarily because of competition from Pan American which has penetrated the New York, Boston, and Washington shuttle market.

### B.

In early 1988, Eastern sought to dispose of the Shuttle when it attempted to spin off the division to Air Shuttle, L.P., a newly formed subsidiary of Texas Air. The transaction was challenged by the IAM. *IAM v. Eastern Air Lines, Inc.*, 127 L.R.R. M. (BNA) 3078 (D.D.C.1988) [1988 WL 25506]. The IAM sought relief and in March 1988, Judge Pratt of this Court found Eastern in contempt of an earlier July 1987 ruling. He enjoined the carrier from taking any steps to spin off the Shuttle operation, pending exhaustion of the dispute resolution procedures of the RLA. His ruling was subsequently vacated on procedural grounds. *IAM v. Eastern Air Lines, Inc.*, 849 F.2d 1481 (D.C.Cir.1988). Meanwhile, Eastern withdrew its proposed plans.

This Memorandum Opinion involves Eastern's second attempt to dispose of the Shuttle when on October 12, 1988, Texas Air officials publicly announced a Purchase and Sale Agreement ("Agreement") between Eastern and Trump Shuttle, Inc. The Agreement provided for sale of the Shuttle division for $365 million in cash to be paid at the closing.

Trump Shuttle was formed in October 1988, by Donald J. Trump. He is the sole stockholder, board chairman and chief executive officer of Trump Shuttle which was formed to effect the purchase from Eastern. Mr. Trump is a successful entrepreneur engaged in real estate developments, hotel operations, and a variety of other enterprises.

### C.

Plaintiffs do not contest the fairness of the $365 million sale price and it is estimat-

ed that the proceeds will provide Eastern with approximately $315 to $320 million net cash. The terms of the Agreement provide that Eastern sell its entire Shuttle division to Trump Shuttle. This includes all ground equipment, airport gate positions, 17 Boeing 727 aircraft, 92 airport landing and take-off slots, 14 airport gates, and related terminal facilities at LaGuardia, Logan, and National airports.

The Agreement provides that the Shuttle may not be resold to any of Eastern's six principal competitors (American, Delta, Northwest, United, USAir, or TWA) for a period of ten years. It also provides that for five years after the sale, Eastern will retain a right of first refusal if Trump decides to sell the Shuttle to those airlines, or if other potential purchasers attempt to buy it. The Agreement further provides that Trump Shuttle shall continue to participate in Eastern's OnePass, frequent flyer program for three years, and that for twelve years thereafter, Trump shall not participate in the frequent flyer program of any other airline.

Deposition testimony and declarations from various witnesses showed that following the sale, Eastern would continue to have substantial flight operations, assets and employees through the LaGuardia, Logan, and National airports. Expert witnesses, James F. Chadbourne and Daniel M. Kasper, agreed that the Shuttle sale would not have a significant impact on Eastern's non-shuttle operations.

Of great concern to plaintiffs is the impact of the Shuttle sale on Eastern's employees. Mr. Trump made it clear in his testimony on behalf of Trump Shuttle, that he extended to Eastern employees an opportunity to work for his company, that he would recognize the three unions, and support the present collective bargaining agreements. The October 12 Agreement provides, *inter alia,* that Mr. Trump will offer guaranteed employment, in order of seniority, to Eastern's employees in the same numbers presently utilized, will establish wages and work rules identical to those in effect at Eastern—with full credit

for seniority, and will not change existing wage rates and work rules without compliance with the Railway Labor Act. Employees would not be hired from any other source unless an insufficient number of Eastern's employees were willing to accept the employment offers. The Agreement also requires Trump to recognize Eastern's unions as the bargaining representative and as Captain John Bavis, an Eastern pilot and ranking ALPA official, testified to "assume as a successor" all rights and obligations of Eastern under any labor contract or the Railway Labor Act, "to the full extent permitted by law." Tr. Dec. 2, 1988, at 111, 113 (Bavis). No Eastern employee is required to accept the offer of employment; the choice is entirely optional. *Id.* at 119 (Bavis).

Mr. Trump's job offers have been accepted by more than a sufficient number of Eastern employees to fully staff the Shuttle. Thus, no employee furloughs are likely as a result of the transaction. Employees who choose not to accept the employment option with Trump may remain with Eastern, employed and treated in accord with the seniority-based employment provisions of their respective collective bargaining agreement.

### D.

The record shows that historically, Eastern has had a record of selling assets and eliminating services without prior bargaining with the unions. Such changes have taken place within the framework of the existing agreements. Captain John Bavis and others, whose deposition testimony or declarations are a part of this record, readily admitted that the following operations were terminated without union bargaining: The 1986 hub in Charlotte, North Carolina, the Moonlight Special between Houston and Chicago, operating between 1984–1987, the Military Airlift Command operations (MAC flights) from 1974–1977, the Montreal, Canada–New York City shuttle operating in the mid–1970s, and the 1980–86 Contract Maintenance Center in Miami.

The Charlotte hub closing resulted in a substantial reduction of flights from 110 to

14 per day accompanied by a nearly 60% reduction within two months of the 176 IAM-represented employees. The Moonlight Special, a late night cargo service, commenced in Houston and was unilaterally transferred to Chicago and then unilaterally discontinued several months later. As a result of that decision IAM-represented employees, in addition to pilots and flight attendants, were displaced. While some of the employees preferred those work opportunities, Eastern did not bargain with the unions but made the unilateral decisions on its own. The MAC flights were chartered services for the United States military. Those non-scheduled operations carried premium pay together with seniority-based crew assignments for pilots and flight attendants. Between 1974 and 1977, there were high averages of MAC departures—38 per month. Since then the operations have been intermittent. In 1987, there were no operations and in 1988, there have been an average of only 11 per month. Again, Eastern's management alone made the decisions. As to the Miami Contract Maintenance Center, the deposition testimony of IAM representative, Charles Bryan showed that the operation was discontinued and employees' bumping and bidding rights were exercised in accordance with the IAM–Eastern collective bargaining agreement.

Several union witnesses testified that the above situations could be distinguished from the Shuttle sale since the Shuttle offered unique and unusual opportunities and personal conveniences for many. However, their testimony while interesting, did not alter the fact that past practices support a finding that significant changes affecting personnel and airline facilities have been made unilaterally by management without collective bargaining over such changes. Nor was their testimony sufficient to overcome the substantial corroboration of such practices otherwise found in the record, upon which the Court has relied.

The impact of the sale to Trump Shuttle pales in comparison to the impact of the September 1988 schedule change. The latter included the elimination and reduction of two major hub services, termination of all services to 14 cities, closure of a pilot domicile center, and disposition of more than 30 aircraft. But even more interesting, is the comparison between several particular items.

Elimination of the Shuttle involves approximately 700 employees, compared with the more than 3,000 affected by the fall schedule. The Shuttle sale results in a curtailment of only 62 departure flights per day from three cities, compared with a net curtailment of 143 daily flights under the fall schedule. Beyond the 62 departures, Eastern will continue its regular flight service to and from Boston, New York, and Washington, D.C., even though the Shuttle division is eliminated. Clearly, the fall schedule resulted in a reduction of far more services. Only 17 aircraft are eliminated by the Shuttle close down, compared to 30 from the fall schedule changes. Finally, there is a decrease of only 1.5% of total available seat miles as compared with the 15.4% decrease associated with the fall schedule.

Our Circuit Court recognized the fall schedule as changes consistent with past practices and consistent with the provisions of the Railway Labor Act. The changes resulting from the Trump sale are far less drastic than those resulting from the fall schedule. Several witnesses offered testimony presenting what they considered to be important distinctions from the Shuttle transaction. Their testimony, while not entirely discounted, is lacking and is insufficient to support a finding that the Railway Labor Act has been violated.

E.

As before, plaintiffs urge that the underlying reason and motive for the decision to sell the Shuttle is Eastern's bias or animus toward unions. After this Court found some merit in their position, our Circuit Court found otherwise and held that there were no forbidden purposes behind Eastern's decision and that there was no basis for a finding of union animus. That Court

made its own judgment from a written record and without benefit of the witnesses' testimony.

Plaintiffs rely substantially on the showing in the earlier preliminary injunction proceedings to support a finding of bias and unlawful interference with union activity. However, they did attempt to strengthen their reliance on the 1987 "CHUNKS" memorandum. P.Ex. 134. They claim that the memorandum was an overt manifestation of union bias, a deliberate plotting by Eastern management and Texas Air to block so-called "oppressive" demands of the IAM and ALPA. That claim, however, was based in large measure on hearsay testimony. After a careful review of plaintiffs' supporting testimony and documentation, the Court finds that their reliance on the CHUNKS memorandum is overdrawn and inconclusive. They have not made a sufficient showing beyond their original effort, which the Circuit Court rejected.

### F.

The principal reason advanced by Eastern for the Shuttle sale is a critical and deteriorating financial condition which could prove fatal to the company's existence. The situation has been ongoing. Since the early 1980s Eastern has been faced with continual financial losses. In 1987, the company faced $194 million in losses before adjustments were made for the sale of certain assets. For the first half of 1988, losses approached $120 million. For the third quarter alone losses approached $349 million before capital gains were reported. More than $100 million in losses are anticipated for the present quarter.

The Eastern witnesses who testified clearly recognized that the company was experiencing a loss of cash and liquidity balances that impacted severely on the company's overall financial health, particularly its dwindling net worth. It is estimated that the Trump Shuttle sale will net at least $315 million after certain debt and expense obligations are discharged. Management maintains that the transaction will offset cash now absorbed by Eastern's large losses, allow it to remain in business, permit it to stem rumors of near insolvency, and stop the growing erosion of consumer confidence. Management testified that the net proceeds from the sale would serve to meet those problems. Eastern officials also testified that available alternatives to the sale were limited and uncertain. In their judgment, the sale would provide much needed liquidity with relatively little, if any, negative impact on the company's remaining core operations; the net cash acquired would allow consideration of long delayed preventive maintenance projects, modernization of operating assets, and improvement of the general quality of service. Absent such efforts, they felt that there was an increasing likelihood that Eastern would be unable to survive the competition which had been accelerated by the Air Line Deregulation Act of 1978 and the entry of Pan American in the shuttle market.

The testimony also showed that Eastern's core business was in dire need. The added cash assets would enable the company to develop its principal operations and generally, it would become a more profitable and upscale business.

Eastern officials were aware of the company's problems and recently undertook certain corrective measures. Current advertisements in the press rank the carrier as outstanding in on-time performance. Advertising budgets, in general, have been increased. Incentive programs to improve both customer service and market penetration have been introduced. New facilities and the upgrading of existing facilities in San Juan and Miami, respectively, have been accomplished. New flight kitchens have been considered and in fact, building operations are underway. With such improvements, Eastern's management contends that it has made a thoughtful and prudent decision to employ the proceeds from the Shuttle sale in a manner that will allow them to continue those and other overdue changes.

### G.

The unions challenge Eastern's claim that there is a critical need for cash and

that the Shuttle sale would improve the company's cash position. The bottom line of their challenge, is that selling the Air Shuttle is simply not prudent. They claim that over the past several years, the Shuttle has returned sizable annual profits and that the indications are that it will continue to earn such profits. They also assert that any financial justification for the sale is belied by the fact that the company has failed to place in operation or even blueprint a well-defined recovery or profit improvement plan. Therefore, they claim, it is inconsistent for Eastern to argue that the sale will help the airline return to profitability when it has not even taken the fundamental planning steps. Based upon these considerations, the unions ask the Court to find that union animus and bias rather than the Company's financial condition serve as the impetus for the proposed sale.

After hearing hours of contradictory testimony by the "experts," the Court feels that Eastern has the better argument. There is no doubt that an ongoing struggle has and will continue to exist between Eastern and its certified bargaining representatives. However, the Court feels that equally plausible is the idea that management is seeking to rebuild the company and place it on a sound financial footing.

The unions claim that management is developing plans to liquidate the company and lead it into bankruptcy. If in fact Eastern is not committed to fighting its deferred maintenance problems but is only half-heartedly engaged in improving the core of its carrier system, then Eastern's executives are acting out a cruel hoax upon the legislative, executive, and judicial branches of our federal government and the general public as well. The passage of time should prove whether this is true.

## II. CONCLUSIONS OF LAW

### A. APPLICATION OF THE RAILWAY LABOR ACT: MAJOR AND MINOR DISPUTES

The Railway Labor Act of 1926 was enacted in an effort to promote stability in labor management relations within the railroad industry. 45 U.S.C. §§ 151–188 (1987). Since 1936, it has governed labor-management relations within the airline industry. 45 U.S.C. §§ 181–87. The Act provides remedies for the resolution of employee disputes arising out of the interpretation of collective bargaining agreements and requires all parties to "exert every reasonable effort to make and maintain" collectively bargained agreements, 45 U.S.C. § 152, First, and to abide by the terms of the most recent agreement until all the dispute resolution procedures have been exhausted. 45 U.S.C. §§ 155, 156, & 160. *See Detroit & Toledo Shore Line R.R. v. United Transp. Union,* 396 U.S. 142, 150–53, 90 S.Ct. 294, 299–301, 24 L.Ed.2d 325 (1969) (*"Shore Line"*).

The resolution procedures depend on whether the dispute is classified as "major" or "minor." A major dispute arises from the formation or change of collective agreements covering rates of pay, rules, or working conditions. *Elgin, J. & E.R. Co. v. Burley,* 325 U.S. 711, 722–27, 65 S.Ct. 1282, 1289–92, 89 L.Ed. 1886 (1945). The RLA establishes elaborate machinery for negotiation and mediation of major disputes. The exhaustive bargaining process is designed to force the parties into serious negotiation and to encourage compromise. 45 U.S.C. § 156. A minor dispute, on the other hand, arises from the interpretation or application of an existing agreement. "The dispute relates either to the meaning or proper application of a particular provision with reference to a specific situation or to an omitted case." *Id.* at 723, 65 S.Ct. at 1290. Such a dispute is one that "arguably" can be covered by the existing collective bargaining agreement. *Maine Central R.R. Co. v. United Transp. Union,* 787 F.2d 780, 782 (1st Cir.), *cert. denied,* 479 U.S. 848, .107 S.Ct. 169, 93 L.Ed.2d 107 (1986) (*"Maine Central"*). Minor disputes are resolved through a formal grievance process that culminates in binding arbitration by the National Railroad Adjustment Board. 45 U.S.C. § 153, First.

A major dispute triggers a status quo obligation. Both the carrier and the

union must preserve the "actual, objective working conditions and practices, broadly conceived, which were in effect before the pending dispute arose and which are involved in or related to that dispute." *Shore Line*, 396 U.S. at 153, 90 S.Ct. at 300. Once a party proposes a change in the collective bargaining agreement, that party is required to serve notice of its intentions (a "section 6 notice"), and both parties must maintain the status quo until the bargaining processes have been exhausted. 45 U.S.C. § 152, Seventh. The Supreme Court has described those processes as "almost interminable." *Shore Line*, 396 U.S. at 149, 90 S.Ct. at 299. Once the process is exhausted without reaching agreement, the parties are released from their status quo obligations, and can resort to "self-help"—management may implement its proposed changes and the unions may strike. *Brotherhood of R.R. Trainmen v. Jacksonville Terminal Co.*, 394 U.S. 369, 378–80, 89 S.Ct. 1109, 1115–16, 22 L.Ed.2d 344 (1969).

■ In a minor dispute, however, the parties are not precluded from changing the status quo; management is free to implement its interpretation of the agreement and a union cannot make a minor dispute the subject of a strike. The changes made by management remain in effect unless declared invalid by the National Railroad Adjustment Board. *United Transp. Union v. Penn Central Transp. Co.*, 505 F.2d 542, 545 (3d Cir.1974).

### B. THE SHUTTLE SALE IS JUSTIFIED BY PAST AGREEMENTS AND PAST PRACTICES

Whether the sale of the Shuttle is classified as a major or minor dispute depends on whether it involves "the acquisition of rights for the future," *Elgin*, 325 U.S. at 723, 65 S.Ct. at 1290, or is "arguably comprehended within an already existing collective bargaining agreement." *Brotherhood of R.R. Signalmen v. Burlington Northern R.R. Co.*, 829 F.2d 617, 619 (7th Cir. 1987) (citation omitted). As our Circuit and other circuit courts have held, they look to the parties' settled past practices to determine whether disputed actions fall within a bargaining agreement. *ALPA v. Eastern Air Line, Inc.*, 863 F.2d 891, 896 (D.C.Cir. 1988), *petition for reh'g pending* (filed Oct. 14, 1988) ("*ALPA v. Eastern*"); *Brotherhood of Maintenance of Way Employees, Lodge 16 v. Burlington Northern R.R. Co*, 802 F.2d 1016, 1017 (8th Cir.1986).

### 1. The Shuttle Sale is Contemplated by Past Agreements

■ Eastern's collective bargaining agreement with Local 553 of the TWU clearly contemplates that Eastern may cut back or relocate its flight attendants. *See* P.Ex. 114, Sections 9, 12, & 15 (Agreement between Eastern and Local 553). Obviously, one reason Eastern would implement such changes would be to reduce the number of flights or alter its schedule. The reason for the work reduction, whether the abandonment of a hub or the sale of an asset, is immaterial. As our Circuit held:

> [T]he [TWU–Eastern] contract's language is quite broad and evidences an awareness that work reductions might be necessary in the future; it does not specify what forces might cause such reductions.

*ALPA v. Eastern*, at 897–98.

As stated previously, the agreements between Eastern and ALPA and IAM have expired and the parties have exchanged section 6 notices. Our Circuit Court's recent decision refused to recognize the expiration of the agreements and the filing of section 6 notices as a major dispute. Rather, it looked to provisions in expired contracts as evidence of settled past practice. *Id.* at 899–900.

The Eastern–ALPA collective bargaining agreement contemplates domicile closures, flight reductions, pilot displacements, and furloughs. *See* D. Ex. 110, Sections 27, 28, & 40 (Agreement between Eastern and ALPA). Similarly, the Eastern–IAM agreement contains provisions dealing with reductions in force, employee furloughs, and transfers. *See* D. Ex. 117, Sections 15, 20, & 28 (Agreement between Eastern and IAM). These provisions not only "indicate that furloughs were contemplated by the

parties," *ALPA v. Eastern,* at 900, but also show that the unions recognized that their employees would be affected by domicile closings and flight reductions. It makes no difference that pilots, mechanics, and ground service personnel were laid off or relocated because planes were sold or because schedules were trimmed back. The collective bargaining agreements themselves serve as evidence of actual working conditions and practices. Because the sale of an asset, such as the Shuttle, is "arguably" within the labor contracts, the dispute may not be characterized as major.

### 2. *The Shuttle Sale is Consistent with Past Practices*

As discussed in this Court's findings, *supra,* at 869–871, Eastern has a well-established history of selling airplanes and cutting back its flight operations. These past practices and working conditions may become part of a collective bargaining agreement even if the agreement is silent regarding the causes of work reductions and furloughs. *See Maine Central,* 787 F.2d at 782. While the agreements between Eastern and the unions fail to specify the procedures to be followed when assets are sold, the Supreme Court has recognized that it would be "virtually impossible to include all working conditions in a collective-bargaining agreement." *Shore Line,* 396 U.S. at 154–55, 90 S.Ct. at 301–02. Courts must determine whether actions similar to a present disputed action had "occurred for a sufficient period of time with the knowledge and acquiescence of the employees to become in reality a part of the actual working conditions." *Id.* at 154, 90 S.Ct. at 301. The court is limited to determining whether the action is supported by past practice—it does not decide whether such action is prudent for the carrier's future:

> If [the carrier] presented instances of past practice accepted by the unions which, arguably, could support its contention, the court's inquiry must end; it is not for it to weigh, and decide who has the better of the argument. If the court did this, it overstepped its bounds and usurped the arbitrator's function.

*Maine Central,* 787 F.2d at 782 (citations omitted).

Our Circuit Court recently held in *ALPA v. Eastern,* at 897–900, that Eastern's past practices included the continued exercise of management rights to discontinue service, sell assets, and reassign or furlough employees. Prior to the Circuit's determination, this Court also found in its August 30, 1988 Memorandum Opinion that Eastern's practices of schedule changes, hub closures and asset sales were part of the actual, objective working conditions and practices followed by the airline. *ALPA v. Eastern Air Lines, Inc.,* 703 F.Supp. 962, 964–65 (D.D.C.1988), *rev'd on other grounds,* 863 F.2d 891 (D.C.Cir.1988). In that August 30, 1988 Memorandum Opinion, this Court held that Eastern's proposed September schedule changes were similar to past actions taken by the airline and concluded that "Eastern should be permitted to implement such changes without first bargaining with plaintiffs." *Id.* at 973.

In reviewing Eastern's record, the Court is reminded that "[p]ast practice is ... not part of the total contract, unless it was accepted." *Maine Central,* 787 F.2d at 783. Eastern has engaged in numerous sales or lease-outs of the same type of assets to be conveyed in the Shuttle sale. In addition, Eastern has frequently changed the size and scope of its operations, reassigned employees, and otherwise engaged in a wide range and variety of changes relating to personnel, facilities and services. Those decisions were not preceded by bargaining with plaintiff unions concerning the decisions or their effects, except as was provided in Eastern's pre-existing labor contracts.

Plaintiff unions have repeatedly tried to distinguish the facts of the Shuttle sale from previous sales or changes in service. They argue that the Shuttle provides unique employment opportunities and working conditions and that the transfer to Trump of a separate operating division is unprecedented. The Court is not persuaded by plaintiffs' attempt to differentiate the Trump deal from other business

decisions of Eastern. Employment opportunities have been changed in the past; working conditions have frequently changed, arising from hub closures or discontinuance of service. Bumping and bidding rights have been frequently exercised by Eastern's employees, schedules have varied and the airlines' employees have adjusted and adapted. The unions have failed to identify any legal cognizable difference between the Shuttle sale and Eastern's repeated closures of principal hubs, elimination of discrete operating units, and sales of assets.

■ This Circuit has stated that "if the shuttle sale is analogous to the closing of a hub, the abandonment of a route or the sale of assets, then a question may be raised whether, under the parties' established bargaining tradition, the proposed action is subject to bargaining." *IAM v. Eastern Air Lines*, 849 F.2d 1481, 1487 (D.C.Cir.1988). After carefully examining Eastern's past practices, the Court holds that the proposed Shuttle sale is similar to prior actions in which the unions acquiesced; therefore, it falls within their bargaining agreements.

Since Eastern has no obligation to bargain with the plaintiff unions over its decision to sell the Shuttle, the proposed action does not create a major dispute. The collective bargaining provisions of the RLA do not prevent consummation of the Shuttle transaction. *See, Japan Air Lines Co. v. IAM*, 538 F.2d 46, 51–52 (2d Cir.1976) (no duty to bargain over decision to continue practice of subcontracting); *IAM v. Northeast Airlines, Inc.*, 473 F.2d 549, 556–57 (1st Cir.), *cert. denied*, 409 U.S. 845, 93 S.Ct. 48, 34 L.Ed.2d 85 (1972) (no duty to bargain over decision to merge) (cited with approval by the Supreme Court in *First Nat'l Maintenance Corp. v. NLRB*, 452 U.S. 666, 683 n. 20, 101 S.Ct. 2573, 2583 n.

20, 69 L.Ed.2d 318 (1981)) ("First National"); *ALPA v. Transamerica Airlines, Inc.*, 123 L.R.R.M. (BNA) 2682 (E.D.N.Y. 1986) (no obligation to bargain over decision to shut down airline and lease 12 aircraft to another carrier).

The Supreme Court has consistently held that fundamental management decisions concerning the scope and direction of an employer's business fall outside the area of mandatory bargaining subjects. Justice Stewart explained in his concurring opinion in *Fibreboard Paper Products Corp. v. NLRB*, 379 U.S. 203, 223, 85 S.Ct. 398, 409, 13 L.Ed.2d 233 (1964), that "[n]othing the Court holds today should be understood as imposing a duty to bargain collectively regarding such managerial decisions, which lie at the core of entrepreneurial control." Seventeen years later, the Court held in *First National*, 452 U.S. at 686, 101 S.Ct. at 2586, that an employer has no obligation to bargain with the union over its decision to terminate a portion of its business. From *Fibreboard* to *First Nat'l Maintenance*, the Supreme Court has recognized that management retains a prerogative to make certain fundamental business decisions without an obligation to bargain with its unions. This concept has also been applied by courts confronted with analogous issues under the RLA.[2] *ALPA v. Eastern*, at 905, 908–910; *Empresa Ecuatoriana de Aviacion v. District Lodge No. 100*, 690 F.2d 838 (11th Cir.1982) *cert. dismissed*, 463 U.S. 1250, 104 S.Ct. 40, 77 L.Ed.2d 1457 (1983); *Japan Air Lines Co.*, 538 F.2d 46; *Northeast Airlines*, 473 F.2d 549; *Railway Express v. Brotherhood of Ry. Airline & S.S. Clerks*, 437 F.2d 388 (5th Cir.) *cert. denied*, 403 U.S. 919, 91 S.Ct. 2230, 29 L.Ed.2d 696 (1971); *Brotherhood of Locomotive Engineers v. Baltimore & Ohio R.R.*, 310 F.2d 503 (7th Cir.), *aff'd*, 372 U.S. 284, 83 S.Ct. 691, 9 L.Ed.2d 759 (1963).

**2.** Parallels between the Railway Labor Act and the National Labor Relations Act should be drawn with caution. *First Nat'l Maintenance*, 452 U.S. 666, 686 n. 23, 101 S.Ct. 2573, 2585 n. 23, 69 L.Ed.2d 318. Where, as here, the language of the two Acts is nearly identical, the schemes similar, and courts have borrowed freely from the cases decided under both Acts,

there is no reason why NLRA precedent may not be relied upon. *ALPA v. Transamerica Airlines, Inc.*, 123 L.R.R.M. 2682 (E.D.N.Y.1986). In *ALPA v. Eastern*, at 909, this Circuit stated that "plaintiffs identify no reason why the latter [RLA] requires us to cast a more jaundiced eye on efforts to exert economic pressure than the former [NLRA]."

The unions argue that Eastern must bargain over the effects of the proposed Shuttle sale *before* the airline can close the deal. The Court disagrees. First, Eastern's actions are "arguably comprehended" on the terms of its agreements with the plaintiffs; therefore, any dispute with respect to the impacts of the Shuttle sale upon employees must be considered minor. When this Court in its August 30, 1988 ruling instructed Eastern to "comply with the intricate RLA bargaining process" *before* it could furlough 4,000 employees in September 1988, this Circuit reversed, finding that the pre-existing provisions of Eastern's collective bargaining agreements contemplated work reductions even though they did not specify what forces might cause such reductions. *ALPA v. Eastern,* at 898, 900, 913; *International Bhd. of Elec. Workers v. Washington Terminal Co.,* 473 F.2d 1156, 1172–73 (D.C.Cir.1972), *cert. denied,* 411 U.S. 906, 93 S.Ct. 1530, 36 L.Ed. 2d 195 (1973).

Secondly, while the Third Circuit in *Railway Labor Executive Ass'n v. Pittsburgh & Lake Erie R.R.,* 845 F.2d 420 (3d Cir. 1988), *cert. granted,* —— U.S. ——, 109 S.Ct. 489, 102 L.Ed.2d 526 (1988) (*"Pittsburgh & Lake Erie R.R."*), held that a carrier must bargain over the effects of its business decisions before implementing any changes, this Circuit and others have disagreed. As our Circuit recently held, the agreements and the course of dealing contemplated the effects of such proposals. *ALPA v. Eastern,* 897, 899–900. In *ALPA v. Transamerica Airlines, Inc.,* 817 F.2d 510 (9th Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 451, 98 L.Ed.2d 391 (1987), where the issue of effects bargaining was not even litigated, the Ninth Circuit recognized as a general principle that effects bargaining could continue after the carrier ceased operations. *Id.* at 512 n. 1. In *Northeast Airlines,* 473 F.2d at 558–59, the First Circuit stated that "[w]here it is clear, as in the case of a merger, that bargaining about some effects of the decision would be ineffective unless the company could be required to renegotiate the merger, we believe that the duty to bargain about those effects does not arise at all."

In *Pittsburgh and Lake Erie R.R.,* the Third Circuit affirmed the district court's status quo injunction, enjoining the sale of the entire business only "to the extent that such sale does not include provisions for the maintenance of the status quo...." *Railway Labor Executives Ass'n v. Pittsburgh & Lake Erie R.R.,* 677 F.Supp. 830 (W.D.Pa.1987). In contrast to the present case, that court enjoined the sale because there was no past practice and the preexisting labor agreement did not provide for the effects of the transaction.

Finally, in *First National Maintenance,* 452 U.S. 666, 101 S.Ct. 2573, the Supreme Court made it absolutely clear that a company need not secure the agreement of its unions or exhaust bargaining before it carries out a decision to close its business. The company's only obligation is to offer "meaningful bargaining at a meaningful time" over the effects of the decision. *Id.* at 682, 101 S.Ct. at 2582. From the outset, Eastern has offered to bargain over its decision to sell the Shuttle to Donald Trump. Matthews Declaration at ¶¶ 5–10 (Dec. 8, 1988). When it announced the Trump deal, an Eastern executive wrote that the airline was "prepared to bargain about the effects of such decisions, as it has in the past, and to entertain any proposals the IAM might present on this subject." Matthews Declaration at Ex. G (Oct 12, 1988 letter from Matthews to Bryan). Eastern has never bargained over possible effects to its unions prior to closing a sale of assets or terminating flights. However, it has engaged in effects bargaining after the transactions and new schedules have been completed. These post-transaction negotiations have been "meaningful" as required by the Supreme Court. For example, Eastern initiated bargaining about the effects of the September 1988 schedule change, offering union members a new early-out option with pass privileges. Eastern reached agreement with the TWU on September 1, 1988, and the IAM on October 3, 1988, on extended leave programs to limit the employee impact of the Fall downsizing. Matthews Declaration at ¶ 4.

### 3. *The Shuttle Sale is a Minor Dispute*

Eastern has met its "relatively light" burden of demonstrating that the Shuttle sale is a minor dispute. *Chicago & N.W. Transp. Co. v. Railway Labor Executives' Ass'n*, 855 F.2d 1277, 1283 (7th Cir.1988), *cert. denied,* — U.S. —, 109 S.Ct. 493, 102 L.Ed.2d 529 (1988) (quoting *Brotherhood of Maintenance of Way Employees, Lodge 16*, 802 F.2d at 1022). Eastern's position cannot be said to constitute the type of clear departure from its past practices necessary to trigger a finding of a major dispute under the RLA format. *Id.* at 1285; *see also, Railway Labor Executives' Ass'n v. Boston & Maine Corp.*, 808 F.2d 150, 159 (1st Cir.1986), *cert. denied,* — U.S. —, 108 S.Ct. 102, 98 L.Ed.2d 62 (1987).

Our Circuit's recent ruling holds true in this case:

> Given the express contractual terms and the similarity between the proposed [action by Eastern] and previous ones, the record compels a finding that Eastern's proposal [is] covered by the collective bargaining agreement and the course of dealing between the company and [its unions]. This [proposed action] is a minor dispute for purposes of resolution through the RLA, and the district court lack[s] jurisdiction to enjoin Eastern's [proposed action].

*ALPA v. Eastern*, at 898. The precedent clearly dictates that in a circumstance such as the present, this Court must deem the matter a minor dispute.

### C. THE SHUTTLE SALE DOES NOT UNLAWFULLY INTERFERE WITH THE UNIONS

Plaintiffs contend that the sale of the Shuttle violates Sections 2 Third and Fourth of the RLA because it undermines the representative status of ALPA, IAM and Local 553 of TWU. They also claim that the sale is unlawful because its purpose is to discourage union activity at Eastern's remaining operations. Eastern counters that the unions have not shown that the airline's decision to sell the Shuttle was motivated by a desire to interfere with the unions. Eastern also contends that under the "mixed motive" *Wright Line* standard, 251 N.L.R.B. 1083 (1980), *enf. granted, NLRB v. Wright Line*, 662 F.2d 899 (1st Cir.1981), *cert. denied,* 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982), there is no labor law violation because Eastern has shown a compelling business need for selling the Shuttle.

 Under the *Wright Line* test, plaintiff must make a *prima facie* showing sufficient to support the inference that the employer's anti-union bias was a "motivating factor." Once this is established, the burden shifts to the employer to demonstrate that it would have taken the same action even in the absence of union animus.

This Circuit recently held in *ALPA v. Eastern*, at 902–913, that attacks on Eastern's flight reductions and employee furloughs as manifesting animus, are subject to analysis under *Wright Line*.

> We are persuaded that the *Wright Line* principle is applicable here.... Application of the *Wright Line* principle will provide [ ] full protection for the union activity protected by § 2 Third and Fourth ... and will avoid creating perverse incentives in either management or labor.

*Id.* at 902.

### 1. *New Evidence of Anti-union Bias is Lacking*

 Plaintiff unions cannot show a likelihood of success on their claim that Eastern's decision to sell the Shuttle was motivated by anti-union animus. In *ALPA v. Eastern*, at 903, our Court of Appeals recently ruled that the record provided little support for any finding that "forbidden purposes" controlled Eastern's decision. Because plaintiffs have failed to present new facts of union animus, the record has not changed since these parties were before this Court in August 1988. They have failed to make out a *prima facie* case in support of their allegations. They cannot satisfy their burden merely by proffering evidence of generalized anti-union bias. *Id.* at 911–912. The unions have the burden of establishing a causal connection between

the employer's hostility and the challenged action. *Id.*[3] Evidence of that causal connection is missing here.

The "CHUNKS" memorandum relied upon to prove that the decision to sell the Shuttle was part of a grand anti-union scheme was rejected by our Court of Appeals as evidence of labor law violations. The Circuit characterized the memorandum as evidence that management wanted to exert "economic pressure," which would not constitute unlawful interference with union rights. The Court relied upon a previous labor law opinion from this Circuit, *United Auto Workers v. NLRB,* 765 F.2d 175 (D.C.Cir.1985):

> [I]t was obviously inherent in Judge Edward's analysis in *UAW* that an employer may exercise its legitimate rights under an agreement, with the deliberate purpose of exerting economic pressure, without being *ipso facto* condemned as manifesting anti-union animus.

*ALPA v. Eastern,* at 909 (citing *UAW,* 765 F.2d at 184). In view of these circumstances, this Court concludes that plaintiffs have not met their burden of proving unlawful motivation to pressure the unions.

### 2. *Eastern Has Shown a Financial Necessity to Sell Shuttle*

Even if there is some evidence that the Shuttle sale was motivated in part by a desire to undermine the unions' representative status, Eastern has met its burden by showing that it would have arranged to sell the Shuttle in the absence of union hostility. More than ten years ago, the Supreme Court held that once the plaintiff carried his burden of persuasion, the burden shifted to the employer to show by a preponderance of evidence that he would have reached the same decision even if, hypothetically, he had not been motivated by a desire to punish the plaintiff for exercising his rights. *Mt. Healthy City Board of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). Since then the Court has applied this allocation of burdens of proof to labor law situations where anti-union sentiment was involved. In *NLRB v. Transportation Management Corp.,* 462 U.S. 393, 403, 103 S.Ct. 2469, 2475, 76 L.Ed. 2d 667 (1983), the Supreme Court held that an employer need only prove that "absent the improper motivation he would have acted in the same manner for wholly legitimate reasons." *Id.* at 401, 103 S.Ct. at 2474.

As set forth in this Court's factual findings, there is credible testimony relating to Eastern's serious financial problems and desperate need for a cash infusion. Eastern's officials and several industry experts, claim that the airline needs several hundreds of million dollars in cash to stay in business. Because compelling business reasons exist for Eastern's sale of the Shuttle, this Court finds that regardless of anti-union bias, the Trump deal "would have occurred in any event and for valid reasons." *Id.* at 400, 103 S.Ct. at 2473 (citing *Wright Line,* 251 N.L.R.B. 1083 (1980)).

### D. THE SHUTTLE SALE IS NOT A SALE OF "SUBSTANTIALLY ALL" OF EASTERN'S ASSETS AND DOES NOT VIOLATE IAM'S STOCK RIGHTS

The IAM claims that its members, as owners of certain preferred stock issued by Eastern under the 1984 Wage Investment Program ("WIP"), are entitled to vote on Eastern's decision to sell the Shuttle. Recognizing that the preferred stock requires a shareholder vote only on a sale of "all or substantially all" of Eastern's assets, the IAM contends that because the Shuttle is Eastern's only profitable opera-

---

**3.** It is not enough that the decision to sell the Shuttle may have an adverse impact on the unions. There must be a specific motive to chill unionism. *See Textile Workers Union v. Darlington Mfg. Co.,* 380 U.S. 263, 276, 85 S.Ct. 994, 1003, 13 L.Ed.2d 827 (1965) (foreseeable consequences no violation "in the absence of a show-ing of motivation which is aimed at achieving the prohibited effect"); *Weather Tamer, Inc. v. NLRB,* 676 F.2d 483, 492 (11th Cir.1982) (plant closure and layoff following union certification do not by themselves serve as a basis for a labor law violation).

tion, its sale amounts to the liquidation of the airline.

The IAM and the other unions have failed to show that the sale of the Shuttle constitutes a sale of "all or substantially all" of Eastern's assets. As the Court wrote in its findings, the Shuttle constitutes only 2.9% of Eastern's total assets at net book value (approximately 7.0% at fair market value), only 1.5% of Eastern's total operation, and only 4.3% of Eastern's total operating revenue. Clearly, the Shuttle cannot be considered "substantially all" of Eastern's assets.

Shareholder approval is not necessary in the ordinary course of business, nor is it usually mandatory in a major restructuring of a corporation. A leading case in this area explains that shareholder approval is not required "simply because an independent, important branch of a corporate business is sold." *Gimbel v. ʃ̇ ıal Cos.*, 316 A.2d 599, 605 (Del Ch.), *uffʼd on other grounds*, 316 A.2d 619 (Del.1974).[4] The Delaware court did state, however, that:

> If the sale is of assets quantitatively vital to the operation of the corporation and is out of the ordinary and substantially affects the existence and purpose of the operations, then it is beyond the power of the Board of Directors.

*Id.* at 606.

At this point, plaintiffs have failed to show that the Shuttle sale will substantially affect Eastern's corporate existence or purpose. There was evidence that after the sale, Eastern will remain a major airline, employing approximately 30,000 people and utilizing over 220 aircraft. The IAM has not established that the Shuttle transaction violates any provision of the WIP.

### E. THE SHUTTLE SALE SHOULD NOT BE ENJOINED

Under the law of this Circuit, this Court does not have subject matter jurisdiction to enter an injunction in a minor dispute. The parties must attempt to negotiate their differences and if negotiations fail, the dispute must be submitted to an arbitration board for resolution. 45 U.S.C. § 184 and § 153, First (i). As our Circuit recently declared, "[T]he arbitration board's jurisdiction over minor disputes is exclusive; the courts do not have jurisdiction to issue status quo injunctions." *ALPA v. Eastern*, at 895–896 (citing *ALPA v. Northwest Airlines, Inc.*, 627 F.2d 272, 275 (D.C.Cir. 1980).

The First Circuit has repeatedly held that when disputes are classified as minor under the RLA, a district court does not have jurisdiction to enter status quo injunctions. *IAM v. Eastern Air Lines, Inc.*, 826 F.2d 1141 (1st Cir.1987); *Brotherhood of Locomotive Engineers v. Boston & Maine Corp.*, 788 F.2d 794 (1st Cir.1986), *cert. denied*, 479 U.S. 829, 107 S.Ct. 111, 93 L.Ed.2d 59 (1986); *Carbone v. Meserve*, 645 F.2d 96 (1st Cir.), *cert. denied*, 454 U.S. 859, 102 S.Ct. 312, 70 L.Ed.2d 156 (1981). That Circuit has pointed to the strong presumption that a minor dispute is the type of controversy mandated by Congress to be resolved outside the judicial system. *IAM v. Eastern*, 826 F.2d at 1145 (citing *Atchison, Topeka & Santa Fe Ry. Co. v. Buell*, 480 U.S. 557, 107 S.Ct. 1410, 1414 n. 9, 94 L.Ed.2d 563 (1987).

·The Supreme Court has addressed the policy against judicial involvement in labor disputes by way of injunctive relief: "An injunction does not settle a dispute—it simply disables one of the parties." *Burlington Northern R.R. Co. v. Brotherhood of Maintenance of Way Employees*, 481 U.S. 429, 107 S.Ct. 1841, 1854, 95 L.Ed.2d 381 (1987). Given this policy and the Circuit's recent decision, the Court finds itself without jurisdiction to issue equitable relief in this case.

### III. CONCLUSION

The traditional factors permitting this Court to issue a preliminary injunction are

---

**4.** *Gimbel* held that the sale of the stock of a wholly-owned subsidiary that represented 26% of the company's assets, 41% of its net worth, and 15% of its earnings, did not constitute a sale of substantially all of the assets. *See Whittaker*

*Corp. v. Edgar*, 535 F.Supp. 933, 951 (N.D.Ill. 1982) (sale of an asset representing at least 26% and possibly as much as 50% of a corporation's total assets is not a sale of substantially all of the assets).

well known. *National Wildlife Fed'n v. Burford,* 835 F.2d 305, 318 (D.C.Cir.1987). Plaintiff unions have failed to meet their burden in this regard. In particular, they have failed to establish either by virtue of the facts or the law that they are likely to succeed on the merits. Further, the balance of equities weighs in favor of Eastern.

In issuing this opinion, the Court holds that the sale of the Shuttle to Donald Trump is a minor dispute under the Railway Labor Act. Under the law of this Circuit, the Court is deprived of the jurisdiction to enter a preliminary injunction. Accordingly, this conflict must be resolved through negotiation and arbitration.

Hopefully, the management of Eastern will not see this decision as an invitation to undervalue the interests of its unions. In selling the airline's premier financial asset, Eastern management leaves itself a special obligation to provide a future for the company and its workers. If management is serious about rebuilding Eastern, now is a good time to start.

An appropriate Order shall be entered.