In re IONOSPHERE CLUBS, INC. and Eastern Air Lines, Inc., Debtors.

Bankruptcy Nos. 89 B 10448, 89 B 10449.

United States Bankruptcy Court, S.D. New York.

May 25, 1989.

See also, Bkrtcy., 98 B.R. 174; Bkrtcy., 101 B.R. 844.

Weil, Gotshal & Manges, New York City (Harvey R. Miller, and Bruce R. Zirinsky, of counsel), Cravath, Swaine & Moore, New York City (David Boies, of counsel), for Eastern Air Lines.

Weil, Gotshal & Manges, Houston, Tex. (Zack A. Clement, of counsel), for Texas Air Inc.

Kramer, Levin, Nessen, Kamin & Frankel, New York City (Joel B. Zweibel, of counsel), for Creditors Committee.

Guerrieri, Edmond & James, P.C., Washington, D.C. (Joseph Guerrieri, of counsel), for Intern. Ass'n of Machinists.

O'Donnell & Schwartz, New York City (Malcolm A. Goldstein, of counsel), for TWU.

Cohen Weiss and Simon, New York City (Bruce H. Simon and Richard M. Seltzer, of counsel), for Airline Pilots Ass'n.

Richard K. Helman, The Port Authority of New York and New Jersey, New York City.

Hazel, Thomas, Fiske, Beckhorn & Hanes, P.C., Washington, D.C. (Stanley J. Samorajczyk, of counsel), for Examiner.

Winthrop, Stimson, Putnam & Roberts, New York City (John F. Pritchard, and Eloise L. Morgan, of counsel), for America West Airlines.

Willkie Farr & Gallagher, New York City (Myron Trepper, of counsel), for Trump Air Shuttle.

## MEMORANDUM DECISION RELATING TO MOTION OF EASTERN AIR-LINES TO AUTHORIZE (i) SALE OF EASTERN AIR SHUTTLE ASSETS AND OPERATIONS, (ii) EXECUTION OF LAGUARDIA AIRPORT EAST END TERMINAL LEASE AND (iii) RELATED RELIEF

BURTON R. LIFLAND, Chief Judge.

### BACKGROUND

On March 9, 1989 (the "Petition Date"), Eastern Air Lines, Inc. ("Eastern") and Ionosphere Clubs, Inc. each commenced a case for relief under Chapter 11 of the Code. Eastern continues to operate its business and manage its properties as a debtor-in-possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code (the "Code"). Eastern is a certificated air carrier engaged primarily in the transportation of persons and property. Eastern is a subsidiary of Texas Air Corporation ("Texas Air") which acquired Eastern in November of 1986. Texas Air also is the parent corporation of Continental Air Lines, Inc. ("Continental").

On October 12, 1988, Eastern and the Trump Airlines Holding Corp. ("Trump Holding") and Trump Shuttle, Inc., f/k/a Trump Shuttle Operating Corp. ("Trump Shuttle"), (hereinafter, collectively, the "Trump Group") entered into an agreement for the sale by Eastern and the purchase by the Trump Group of the assets and operations of the Eastern Air Shuttle ("Shuttle Assets").

In November of 1988, the Air Line Pilots Association, International ("ALPA"), the International Association of Machinist and Aerospace Workers ("IAM") and the Transport Workers Union ("TWU") initiated an action in the United States District Court for the District of Columbia ("District Court") to enjoin the sale of the Shuttle Assets on the ground that such a sale would constitute a violation of the Railway Labor Act. A hearing was held on the motion of ALPA, IAM and TWU for a preliminary injunction against the sale. On December 19, 1988, the District Court found that "compelling business reasons exist for Eastern's sale of the Shuttle" and denied the motion for a preliminary injunction. *See, Air Line Pilots Ass'n Intern. v. Eastern Air Lines*, 701 F.Supp. 865 (1988). An appeal from the decision is stayed by reason of the intervention of Eastern's Chapter 11 case and the application of § 362(a) of the Code.

On March 4, 1989, the IAM commenced a labor strike against Eastern. ALPA and TWU joined the labor strike, allegedly in sympathy with the IAM. The labor strike substantially grounded Eastern's flight operations with attendant cessation of major revenues and related operating and fiscal

problems. As a consequence, and on March 9, 1989, Eastern commenced its Chapter 11 case.

In the perspective of the foregoing events, it is alleged that the Trump Group elected to exercise its rights under the "material adverse change" clause of the purchase and sale agreement. Pursuant to such clause, the Trump Group could defer the closing of the purchase and sale to as late as October 12, 1989, so as to allow for the cure of the material adverse change or otherwise provide for the elimination of the effect of such occurrence(s). (Debtor's Exhibit 1, Paragraph 1.6; TR. 90, 129–30). After the exercise of the aforesaid rights by the Trump Group, negotiations ensued between the Trump Group, Eastern and Texas Air which resulted in the amendatory agreements, dated as of March 31, 1989.

By Order of this Court dated April 12, 1989, fixing date, time and place for hearing and prescribing notice thereof, Eastern as Debtor and Debtor-in-possession ("Debtor") moves pursuant to §§ 365 and 363 of the Code for authority to (a) assume that certain Shuttle Purchase and Sale Agreement, dated as of October 12, 1988, by and among Eastern, and the Trump Group as amended by agreement and related documents dated as of March 31, 1989 (the "Trump Agreement"); (b) sell assets and assume and assign the executory contracts and unexpired leases described in the Trump Agreement (collectively, the "Shuttle Assets") to the Trump Group free and clear of liens, claims and encumbrances except to the extent permitted under the respective documents; (c) execute and deliver that certain Agreement of Lease, by and among Eastern, Continental and The Port Authority of New York and New Jersey ("Port Authority") relative to the East End Terminal Lease transaction (the "East End Terminal Lease") and other documents; and (d) execute and deliver all other documents and do all other things and take all further actions as may be necessary or appropriate to the consumation of the sale of the Shuttle Assets and of the East End Terminal Lease. The terms of the said purchase and sale agreement,

related documents and transactions and schedules of assets, etc. are set forth in full in Debtor's Exhibits 1–152 and 154–159. (Tr. 47).

Various objections to Eastern's Motion have been filed. The majority object to a separate sale of the Shuttle Asset at this time. Others go to the structure of the sale process. All of the objections have either been overruled at the prior May 16th Hearing, withdrawn, or are disposed of herein. Thus, no party to an executory contract or unexpired lease to be assumed and assigned pursuant to the purchase and sale of the Shuttle Assets has preserved, or is pressing any objection thereto. Additionally, no party asserting a lien or encumbrance against the Shuttle Assets has preserved, or is pressing, any objection to the sale of the Shuttle Assets. America West Airlines, Inc. ("America West") objected to the extent that the sale of the Shuttle Assets is couched as a motion for authority to assume a pre-petition executory contract *as amended post-petition.*

On or about May 10, 1989, America West filed its own "Offer to Purchase Eastern Shuttle and Other Eastern Assets" and, subsequent to that date, engaged in discussions with Eastern concerning the terms of an America West offer. (Tr. 27–31). A proposal was presented to Eastern and other parties in interest, pursuant to the terms of such proposed agreement ("America West Agreement"), America West proposed to purchase, *inter alia,* the Shuttle Assets (net of the 21 aircraft that would be sold under the Trump Agreement) in consideration of a cash purchase price of $375 million; plus an additional ten Boeing 757–225 aircraft for $323,400,000.

It should be noted that the Official Committee of Unsecured Creditors (the "Creditors' Committee") supports the sale of the Shuttle Assets and had evaluated the America West proposal as higher than the Trump Agreement by an amount ranging from $72 to $89 million (TR. 60). The America West offer was subject to the obtainment of a satisfactory financing commitment on or before May 24, 1989 at 5 o'clock p.m. The commitment was not ob-

tained and the America West offer was withdrawn.

## DISCUSSION

ISSUE I: Whether the Trump Agreement is a sale of assets pursuant to Section 363 or Section 365 of the Code.

■ At this juncture, it is important to clarify whether, as a matter of law, the Trump Agreement which Eastern seeks to assume in its Motion is a pre-petition executory contract which is sought to be assumed pursuant to § 365 of the Code or whether the pre-petition agreement has been terminated so that the Amended Trump Agreement is solely a § 363(b) sale of assets "other than in the ordinary course of business".

Although the business judgment rule is the standard to be applied under either scenario, America West may be correct in asserting that "the consequences of the Debtor's mischaracterization of the transaction may be significant to the Debtor's estate, to competing bidders ... and to other interested constituencies (including creditors and interest holders)." (America West's Objection at para. 8). Thus, it is argued by this rival bidder that because the rejection or breach of a pre-petition executory contract gives rise to a claim pursuant to *inter alia* § 502(g) of the Code for rejection damages, potential bidders are forced to enter the arena on a tilted playing field favoring the Trump Agreement. Furthermore, it should be noted that the claims that could arise from a pre-petition, non-assumed, non-executory or repudiated agreement are potentially different in nature, classification and amount from those arising from a purely post-petition sales transaction.

As stated previously, on October 12, 1988, Eastern entered into the original Trump Agreement to sell the Shuttle Assets to the Trump Group for $365 million. After the Petition Date, due to what have been referred to in the application as "material adverse changes," Eastern, Texas Air and the Trump Group purportedly entered into an "amended" Agreement on or about March 31, 1989. At this point, no facts have been submitted by the parties to the "amended" Agreement detailing the events which occurred between the Petition Date and the signing of this "amended" Agreement which would assist this Court in making a determination that the original Trump Agreement had not been terminated. Instead, the parties assert that the Trump Group merely deferred the closing of the purchase and sale. (Tr. 90, 129–30). If the original Agreement was terminated, there would be no pre-petition executory contract to be assumed. Thus, independent of the parties' self proclaimed "amendment" characterization, it is clear from a review of their terms that the "amended" Agreement is so materially different from the original pre-petition document that it is, indeed, a new post-petition agreement which is advanced for approval of the Court solely pursuant § 363 of the Code. Examples of material changes or differences are as follows:

1) The new Agreement contains an additional four Boeing 727–200 aircraft, however, the purchase price for the Shuttle Assets remains at $365 million. The estimated market value of said aircraft is approximately $16 million.

2) As Eastern states in its own Motion that in order to induce Trump Shuttle to enter into the Amendment dated as of March 31, 1989 to the Trump Agreement, Texas Air deposited into escrow (a) $4 million to secure Eastern's $4 million escrow deposit referred to above and (b) on behalf of Eastern an additional $4 million, for a total of $8 million which Trump Shuttle is to receive if the Shuttle Agreement is terminated under circumstances specified in the Termination Agreement as described below. Texas Air was required to deposit the first $4 million into escrow because this Court had not approved the Eastern escrow deposit, and the second $4 million because this Court had not pre-approved the Amendment to the Trump Agreement requiring Eastern to put up an additional $4 million as security for the termination fee. (Eastern's Motion at para. 27).

3) Texas Air, Trump, Eastern and Trump Shuttle have executed a Termination Agreement dated as of March 31 1989 which provides, among other things, that Texas Air on behalf of Eastern is obligated to pay to Trump Shuttle $8 million if the Trump Agreement is terminated because (a) the Bankruptcy Court does not approve the transaction within 45 days of the filing of this Motion and neither Trump nor Trump Shuttle has delivered in writing a repudiation of the Trump Agreement; or (b) the Shuttle sale is not consummated within 14 days after the Court's approval of the Shuttle sale, for any reason other than a material breach of the Trump Agreement by Trump or Trump Shuttle; provided, however Trump Shuttle shall be entitled to the $8 million termination fee if both Eastern and Trump Shuttle (or both Eastern and Trump) are in material breach; or (c) Eastern's Board of Directors has recommended or sought approval from the Bankruptcy Court for the sale of the Shuttle (alone or with other assets of Eastern) to a person other than Trump Shuttle, in a manner inconsistent with the Trump Agreement. (Eastern's Motion at para. 29).

4) Texas Air Corp. has guaranteed the payment of all monetary obligations and the performance of all other obligations undertaken by Eastern under the Trump Agreement. The Texas Air Guaranty survives the closing and is unlimited in its amount and duration. (Eastern's Motion at para. 31).

Furthermore, it is uncontroverted that the key parties to the agreement in public statements to the press with respect to the original Agreement, have used clear language of repudiation and expressed a recognition that the Shuttle Assets were once again on the open market. (*See*, America West's Objection at para. 17–23 and references contained therein).

Thus, based upon the aforementioned analysis, this Court finds that the "Amended Trump Agreement" is not a pre-petition executory contract which may be assumed pursuant to § 365 of the Code, rather, Eastern's Motion to sell the Shuttle Assets is treated as a quest for authority to enter into a new post-petition sales transaction out of the ordinary course of business pursuant to § 363 of the Code. The transaction therefore is subject to higher and better offers.

ISSUE II: Whether the decision to sell the Shuttle represents the exercise of reasonable business judgment and is in the best interest of Eastern's estate.

A) THE *LIONEL* TEST.

The main objection raised by the ALPA, TWU and IAM, (collectively, the "Unions"), is that the sale of the Shuttle operation is part of Eastern's overall "creeping" plan of reorganization and therefore the sale may not be consummated prior to the acceptance and outside of any plan of reorganization. Thus, relying on *In re Lionel Corp.*, 722 F.2d 1063 (2d. Cir.1983), the Unions argue that it is premature for this Court to approve the proposed Shuttle sale.

In *Lionel*, the Second Circuit stated the issue as follows:

> The issue now before this court is to what extent Chapter 11 permits a bankruptcy judge to authorize the sale of an important asset of the bankrupt's estate, out of the ordinary course of business and prior to acceptance and outside of any plan of reorganization.

722 F.2d at 1066.

The Court then focused on § 363(b) of the Code which provides that "[t]he Trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b). The Court stated that "[o]n its face, Section 363(b) appears to permit disposition of any property of the estate of a corporate debtor without resort to the statutory safeguards embodied in Chapter 11 of the Bankruptcy Code...." *Lionel*, 722 F.2d at 1066. However, the Court concluded that based upon an "analysis of the statute's history and over seven decades of case law convinces us that such a literal reading of Section 363(b) would unnecessarily violate the congressional scheme for corporate reorganizations." *Id.* Thus, the Second Circuit held as follows:

[T]here must be some articulated business justification, other than appeasement of major creditors, for using, selling or leasing property out of the ordinary course of business before the bankruptcy judge may order such disposition under Section 363(b).

*Id.* at 1070. The Court emphasizing the need for disclosure before a debtor will be allowed to circumvent the safeguards of Chapter 11 by a § 363(b) sale further held as follows:

The rule we adopt requires that a judge determining a § 363(b) application expressly find from the evidence presented before him at the hearing a good business reason to grant such an application.

*Id.* at 1071. The Court then directed the bankruptcy judge to consider "all salient factors pertaining to the proceeding," listing the following factors as "not intended to be exclusive but merely to provide guidance to the bankruptcy judge."

He might, for example, look to such relevant factors as the proportionate value of the asset to the estate as a whole, the amount of elapsed time since the filing, the likelihood that a plan of reorganization will be proposed and confirmed in the near future, the effect of the proposed disposition on future plans of reorganization, the proceeds to be obtained from the disposition vis-a-vis any appraisals of the property, which of the alternatives of use, sale or lease the proposal envisions and, most importantly perhaps, whether the asset is increasing or decreasing in value.

*Id.*

■ Finally, pursuant to *Lionel,* Eastern clearly bears the burden of demonstrating that a sale of property out of the ordinary course of business under § 363(b) of the Code will aid Eastern's reorganization and is supported by a good business justification. *Id.* Although the aforementioned criteria enumerated in *Lionel* were not intended to be an exclusive list, an analysis of each individual factor would provide this Court with the guidance necessary for determining whether Eastern has indeed met its burden in establishing that it has used good business judgment in seeking to sell the Shuttle Assets.

1) *The proportionate value of the asset to the estate as a whole.*

■ Eastern has submitted the following evidence at the hearing which has gone uncontested as to the proportionate value of the asset to the estate as a whole.

Prior to the commencement of the labor action, the net book value of the assets used in the Air Shuttle operation constituted approximately 2.9% of the total net book value of Eastern's assets; the air shuttle operation used approximately 6.7% of Eastern's aircraft fleet totalling 225 aircraft; the Air Shuttle operations accounted for 1.5% of Eastern's total 'assigned seat miles'; on the average for the prior 5 years, the Air Shuttle operations generated net income of $19 million dollars and, on a cash flow basis after adding back depreciation, generated and annual average positive cash flow of between $40 million and $60 million, in contrast to Eastern's gross annual revenues of between $3 billion and $3,5 billion. (*See,* TR. 88–89).

ALPA argues that these figures underestimate the real worth of this "crown jewel" of Eastern's operations. In support of its position, ALPA relies on Eastern's Response And Opposition To Motion Of Moreton Rolleston at para. 13, which illustrates that the cash flow generated from the Shuttle's annual operation is substantially greater than the $25 million annual profit Eastern projected finally achieving in 1990 in its recently presented 5 year business plan, which assumes the sale of $1.8 billion of assets, including the Shuttle. (ALPA's Objection at para. 19).

ALPA's argument, however, is unpersuasive. Eastern has articulated that it is in need of cash and that some assets must be sold off immediately in order to raise working capital. "The infusion of liquidity provided by the Shuttle sale will make cash available to enable Eastern to continue to meet its obligations under real property leases and aircraft leases and financing subject to Section 1110 of the Bankruptcy

Code, to resume operations and provide the liquidity to fund payments under a plan of reorganization." (Eastern's Motion at para. 47; TR. 89–90). In fact, ALPA conceded at the May 16th Hearing that an additional influx of cash was necessary to reorganize. (TR. 113).

Moreover, Eastern states that it identified its Shuttle operations as an appropriate candidate for sale because it believed that "[t]he Shuttle could be easily severed without adverse effect on the remaining Eastern system and its value as a separate, distinct operation could be quickly determined and converted into cash." (Eastern's Motion at para. 44). "The Shuttle has long been operated as a discrete, separate operation within Eastern, using dedicated aircraft, gates, equipment and facilities." (Eastern's Motion at para. 49; TR. 93). In addition, the Air Shuttle is essentially a non-reservation air carrier in which virtually all of the traffic carried on the Shuttle is local, involving point-to-point traffic between New York and Boston, and New York and Washington. (TR. 100). Thus, this Court concludes that based upon the uncontested, credible testimony, the sale of the Shuttle will not have a significant impact on Eastern's non-shuttle operations.

2) *The amount of elapsed time since the filing and the likelihood that a plan of reorganization will be proposed and confirmed in the near future.*

As to the amount of elapsed time since the filing of the petition and the likelihood that a plan of reorganization will be proposed and confirmed in the near future, although this case from the beginning has moved at a rapid pace, for many purposes it is still in its initial triage stage. ALPA citing to *In re Beker Indus. Corp.*, 64 B.R. 900, 906 (Bankr.S.D.N.Y.1986), *rev'd on other grounds*, 89 B.R. 336 (S.D.N.Y.1988) states "[a] sale of assets out of the ordinary course of business prior to a formulation of a plan of reorganization is entirely inappropriate at this early 'crucial stage where the path the Debtor will take is to be determined.'" (ALPA's Objection at para. 23). However, as will be discussed later,

although the path the Debtor will take has not as of yet been determined, it is clear from this record that the sale of the Shuttle at this juncture will not preclude the estate from following the alternative routes which are presently being considered. The critical point which Eastern has established is that whether the road to a consensual confirmed plan is long and windy or short and direct, it is highly unlikely that a plan will be confirmed soon enough to "obviate the need to sell the Shuttle now, obtain liquidity from it, and use that liquidity both to make debt payments required in Chapter 11, and to resume operations as promptly as possible." (Eastern's Memorandum at 11).

Of course, "[t]he need for expedition, however, is not a justification for abandoning proper standards." *Lionel*, 722 F.2d at 1071 (quoting *Protective Comm. for Indep. Stockholders v. Anderson*, 390 U.S. 414, 450, 88 S.Ct. 1157, 1176, 20 L.Ed.2d 1 (1968)). Eastern has demonstrated that it needs a substantial amount of cash for viability within the very near future. (Trans. at 105–111). The cash reserve, as of the Petition Date, in excess of $200 million has been eroded by losses testified to be substantially in excess of $1 million per day. The airlines ability to generate revenues is crippled by the strike. Ironically, even ALPA's own "expert" witness testified that in order to raise the cash Eastern would need, it would have to at some point sell off assets (after obtaining expensive bridge financing). (TR. 185–86). The ALPA witness's testimony that Eastern could obtain further financing at this point is insufficient to warrant the substitution of that witness's "business judgment" for that of Eastern's, unless it is established that Eastern has failed to articulate a sound business justification for its chosen course. In this instance, the testimony of Eastern's President and Chief Executive Officer, Mr. Phil Bakes, which this Court finds credible, supports this Court's finding that Eastern has articulated a good business reason for selling the Shuttle operations.

*3) The effects of the proposed disposition on future plans of reorganization.*

To date, the principal alternatives for proceeding in this case may be summarized as follows: (i) the sale of Eastern as a going concern; (ii) an internal reorganization of Eastern pursuant to its recently proposed downsizing plan (or a variation thereof); and (iii) the realization of value for creditors and equity holders through the disposition of Eastern's assets on a liquidation basis. The Unions therefore argue that a sale now would have a significant impact on any future reorganization "because until any forthcoming bids have been received and analyzed ... action on Eastern's pending motion would be premature." (IAM's Objection at 19). (*See also,* Objection of the TWU at para. 4). However, a further delay of the sale of the Shuttle based upon the Unions' perhaps unrealistic view of the situation and their hope for a "White Knight" is unwarranted.

In order to give alternative (i), the sale of Eastern as a going concern, time to "play out", this Court, upon the recommendation of the Examiner, entered a scheduling Order at the conclusion of the May 3, 1989 hearing which stated *inter alia* that (a) all offers for the purchase of Eastern (as a whole) or the Shuttle must be submitted on or before May 10, 1989, and (b) a hearing was scheduled for May 17, 1989 to advise the Court of the status of those offers, if any. Further, this Court directed that this hearing on the Shuttle sale be commenced on May 12, 1989 (as originally noticed), but stated that no order with respect to Eastern's Motion would be entered prior to the conclusion of the May 17, 1989 hearing.

As stated by the Examiner at the May 16, 1989, and as it has become apparent to this Court, "[t]here are no other real live offers out there yet." (TR. 77). Thus, this Court accepts and fully adopts the Response of the Creditors' Committee which states that "[t]he sale of the Shuttle is not inconsistent with alternatives (ii) and (iii) ..., and alternative (i) is, at the moment, moot." (Creditors' Committee's Response at para. 6).

*4) The proceeds to be obtained from the disposition vis-a-vis any appraisals of the property.*

There has been no dispute that the $365 million sale price for the Shuttle in the Trump Agreement is a fair price. Indeed, there has been no evidence offered which would put into question that the Agreement was not the result of arms length negotiations between Eastern and Trump Shuttle. (TR. 95). Based upon this negotiated sales price, Eastern contemplates that it will net approximately $300 million in cash from the Shuttle Sale, (TR. 93), which will be essential for Eastern's rehabilitation and reorganization, whichever one of the three alternatives mentioned previously is eventually adopted.

*5) Whether the asset is increasing or decreasing in value.*

Although the Unions vehemently argued that the Shuttle was not decreasing in value, the uncontested evidence demonstrates just the opposite. Eastern's market share for the air shuttle operations has steadily declined from a high point of 65% of the market in January, 1987 to 53% in November/December, 1988. (Debtor's Exhibit 162; Tr. 102, 117–119). The March 4, 1989 strike by Eastern's Unions has had a serious effect on Shuttle operations. Despite the fact that Eastern initially drastically cut its rates and more recently engaged in various other promotional programs, Eastern's market share has declined since the strike dropping to 24% in March, 1989 and 23% in April, 1989. (Debtor's Exhibit 162; TR. 91, 117–19). The operations of the Air Shuttle during January and February, 1989 were essentially at a breakeven level, but produced a net loss on a profit and loss basis of approximately $5.85 million in March, 1989 and $4.0 million in April, 1989. (Debtor's Exhibit 163; TR. 92–93). Further, the Air Shuttle operations produced a positive cash flow of approximately $2.1 million in February, 1989, but after the labor action and commencement of the Chapter 11 case, the cash flow declined dramatically with a resulting negative cash

flow of $4.3 million in March, 1989 and a negative $2.4 million in April, 1989. (Debtor's Exhibit 164; TR. 93, 118–120). Moreover, Eastern's main competition, the Pan Am Shuttle, has been experiencing record load factors and, for the first time, the Pan Am Shuttle's market share has been greater than that of the Eastern Shuttle. (Debtor's Exhibits 162–164; TR. 91, 102, 114–116).

## B) INDEPENDENT BUSINESS JUDGMENT.

Finally, both ALPA and IAM allege in their papers and oral argument that based upon conflicts of interest, the decision to sell the Shuttle was not the result of an independent business judgment made by Eastern for the benefit of the estate but rather for the benefit of Texas Air, Jet Capital and Continental. In support of this proposition, the Unions rely on Examiner Shapiro's preliminary summary which states as follows:

> Texas Air's (and Jet Capital's) decision to operate Eastern and Continental as separate subsidiaries may be justifiable from a business standpoint, but it has given rise to a web of personal and financial inter-relationships among the four corporations and their management that creates substantial conflicts of interest in this case. For example, Eastern's rebirth as an independent competitor to Continental might disadvantage Continental but nevertheless be in the best interests of the estate; and decisions concerning how a downsized Eastern should be configured might conflict with Continental's business interest. Even Eastern's sale of its Air Shuttle division will, if successful, have a direct economic effect on Jet Capital.

Summary of Examiner's Recommendations at 2 (May 3, 1989).

As further evidence of this alleged "conflict of interest," both ALPA and IAM argue that Texas Air's 1988 Form 10–K, filed with the SEC, reveals that, beginning February 1, 1989, at Texas Air's request, Jet Capital began acting as financial advisor and providing other assistance to Texas Air

and Eastern in connection with Eastern's proposed sale of the Shuttle. For those services Jet Capital was paid fees of $1,250,000 in 1988, and $200,000 in the first quarter of 1989. If the Shuttle transaction is completed, Texas Air has agreed to pay Jet Capital a fee of $\frac{3}{4}$ of 1% of the amount by which the purchase price exceeds $225,000,000 (less the $200,000 already paid in 1989). Thus, the IAM states that based upon the proposed purchase price of $365 million, Texas Air on behalf of Eastern will pay Jet Capital an additional $1,050,000. (ALPA's Objection at para. 8; IAM's Objection at 10).

At the hearing on May 16, however, the Unions failed to establish that the decision to sell the Shuttle operations was tainted in any manner which would preclude this Court from finding that Eastern has articulated good business judgment which would benefit the entire estate. Even applying the "strict scrutiny" test advocated by ALPA (*See*, ALPA's Objection at para. 10) (citing *Pepper v. Litton*, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939); *In re Anchor Exploration Company*, 30 B.R. 802 (N.D.Okla.1983); *In re Anchorage Boat Sales, Inc.*, 29 B.R. 275 (Bankr.E.D.N.Y. 1983)), this Court still comes to the conclusion that Eastern's decision to sell the Shuttle operations was an independent, unanimous business decision made by Eastern's Board of Directors, (including the two members of such board elected or appointed at the recommendation or behest of Eastern's labor Unions), as a fiduciary, in the best interest of the estate. (TR. 90, 95). In fact, both the Creditors' Committee's and the Examiner's support of Eastern's Motion dispels the Unions' accusations that this particular transaction was the result of a conflict of interest bias on the part of Texas Air. (TR. 60, 77).

The Creditors' Committee in its response to Eastern's Motion stated that it believed "the sale of the Shuttle represents a prudent business decision by Eastern which comports with the current business realities of this case and with the legal standards for the sale of assets by a debtor in possession prior to a plan of reorganization." (Creditors' Committee's Response at

para. 10). Furthermore, the Creditors' Committee concluded as follows:

> "In light of the absence of any bona fide third party offers, ... the proposed sale of the Shuttle to Trump, subject to higher and better offers, represents a significant business opportunity, the effect of which will be to provide the basis for a substantial cash recovery to creditors, and if warranted, a source of operating capital for restarting the airline. Rather than undermining the reorganization effort, the sale of the Shuttle at this time provides a critical base, if appropriate, for reorganizing Eastern, and in any event assuring a substantial cash recovery to creditors."

(Creditors' Committee Response at para. 11).

Finally, ALPA argues that the proposed assignment to Texas Air of Eastern's valuable first refusal and purchase rights acquired from the Trump Shuttle allegedly without receiving fair consideration, is sufficient evidence that a conflict of interest exists to warrant this Court's denial of Eastern's Motion to enter into the Trump Agreement. This Court is not persuaded that the allegation, even if ultimately proven accurate, taints the entire transaction to the extent that it is precluded from granting Eastern's Motion to sell the Shuttle Assets. Rather, this Court finds that the alleged conflict falls within the purview of the Examiner's broad mandate and should be part of his overall investigation. Thus, if this allegation should prove out, the ramifications can be dealt with at the proper time, in a separate proceeding. In any event, there is no present showing that the assignment by Eastern to Texas Air is in the best interest of the estate. Therefore, so long as the Debtor remains in Chapter 11 any such assignment shall be subject to approval of this Court after notice and hearing.

Thus, based upon the entire record and the aforementioned analysis, this Court does find that the sale of the Shuttle Assets as proposed by Eastern represents the exercise of independent, good faith, non-coerced business judgment on the part of Eastern and its Board of Directors. Furthermore, Eastern has articulated compelling business reasons for the sale of the Shuttle operations at this time.

## C) THE EAST END TERMINAL.

■ A related and integral part of the Trump Agreement is the East End Terminal Lease transaction (Debtor's Exhibits 75–82, 146). The execution of the East End Terminal Lease and the construction of the passenger terminal contemplated by such Lease is a condition imposed by the Port Authority to its consent to the assumption and assignment of the Shuttle Terminal Lease to the Trump Group or the sale of the Shuttle Assets. (TR. 40, 49–50). Thus, the approval of this transaction as well is essential to the overall Shuttle Sale Transaction.

Eastern and Continental believe that the East End Terminal Lease transaction is an acceptable and beneficial transaction, particularly since negotiations with respect to the construction of such a terminal have been ongoing with the Port Authority for almost two years prior to the Trump Agreement. (TR. 47).

The East End Terminal Lease encompasses a construction contract, a financing agreement and an operating lease, pursuant to which Eastern and Continental would be jointly and severally liable as tenants of the East End Terminal with the obligation to construct and substantially complete the East End Terminal by December 31, 1991. (Debtor's Exhibit 75). The Port Authority will be obligated to finance the construction of the East End Terminal up to a total of $162 million. The current estimated cost of construction is approximately $100 million. (Tr. 50–51).

In addition to the obligation for the construction of East End Terminal, Eastern and Continental are obligated to spend not less than an additional 13% of the cost of construction for interior improvements to the East End Terminal, consisting of carpeting and other leasehold improvements. Pursuant to a sharing agreement among Eastern, Continental and the Trump Group, Eastern may be obligated for up to approx-

imately $5-6 million of such additional costs. (Debtor's Exhibit 113; Tr. 51).

The East End Terminal Lease provides for the repayment of the construction costs advanced by the Port Authority in the form of facility rent over a 25-year period after the completion of construction of East End Terminal, with an imputed interest rate of 12.25%. (TR. 53). Pending completion of the East End Terminal, Eastern will continue to occupy the terminal facilities used by it in the Central Terminal Building at La-Guardia Airport on the same terms currently in effect. (Tr. 53). Necessary to the construction of East End Terminal is the area occupied at LaGuardia Airport by Hanger No. 8 leased by Eastern, Hanger No. 6 leased by Continental and vacant land adjacent to the Eastern Air Shuttle Terminal. Upon execution of the East End Terminal Lease, Eastern and Continental will surrender such portion of terminal facilities currently used by each of them as is necessary to construct the East End Terminal. (Debtor's Exhibits 76, 77, 80; TR. 50, 53). The East End Terminal, in all probability, represents the last passenger terminal that may be erected in LaGuardia Airport. (Tr. 20).

Eastern and Continental have entered into a Co-Tenancy Agreement defining their respective rights and obligations which, in essence, provides for their equal sharing in the use of East End Terminal and in its cost of construction, operation and maintenance. The Co-Tenancy Agreement also contain mutual provisions regarding termination and consequences of default. (Debtor's Exhibit 146; Tr. 53-54). The East End Terminal Lease, when effective, provides for a rolling 30-day term, a standard provision of Port Authority lease. (Tr. 51).

This Court is persuaded and finds that the East End Terminal Lease transaction constitutes a potentially valuable and beneficial business opportunity for Eastern with minimal financial exposure. (*See,* Tr. 47). This Court therefore concludes, that based upon the record before it, the entry into the East End Terminal Lease is supported by good business justifications and is in the best interest of Eastern's Estate.

### D) CONCLUSION.

To summarize, based upon the lack of any higher or better offer, this Court finds that the sale of the Shuttle Assets pursuant to the Trump Agreement and the assumption of executory contracts and unexpired leases and assignment of such contract and leases pursuant to § 365 of the Code, as provided by such agreements, and the approval of the East End Terminal Lease transaction and related agreements is in the best interests of Eastern and of all parties in interest. Eastern has articulated sound business reasons for, and is appropriately exercising business judgment with respect to, its decision to sell the Shuttle Assets. Moreover, the terms of the purchase and sale of Shuttle Assets were agreed upon after arm's length negotiations between Eastern and the Trump Group and the Shuttle Assets are being sold pursuant to a good faith transaction.

Thus, Eastern's Motion is hereby approved as modified by and in accordance with this memorandum decision. An implementing order will be entered forthwith.