**In re THE LESLIE FAY COMPANIES, INC., Debtors.**

**Bankruptcy No. 93–41724 (TLB).**

United States Bankruptcy Court, S.D. New York.

June 21, 1994.

See also 166 B.R. 802.

Weil, Gotshal & Manges by Alan Miller, Brian Rosen and Norman Rosenbaum, New York City, for debtor.

Mudge Rose Guthrie Alexander & Ferdon by Joel Cohen, New York City, Special Labor Counsel to debtor.

Marcus Montgomery Wolfson P.C., by Marc Richards and Lisa Buckley, New York City, for Intern. Ladies Garment Workers' Union, AFL–CIO.

Brent Garren, New York City, Asst. Gen. Counsel for Intern. Ladies Garment Workers' Union, AFL–CIO.

Wachtell, Lipton, Rosen & Katz by Richard Mason, New York City, for Official Committee of Unsecured Creditors.

Lord, Bissell & Brook by Benjamin Waisbren, Chicago, IL, for Official Committee of Equity Security Holders.

## OPINION ON UNION'S MOTION TO CONFIRM AND DEBTOR'S CROSS–MOTION TO VACATE AN ARBITRATION AWARD

TINA L. BROZMAN, Bankruptcy Judge.

The International Ladies' Garment Workers' Union, AFL–CIO (the "Union"), seeks to confirm an arbitration award which would compel The Leslie Fay Companies, Inc. ("Leslie Fay") to adhere to a postpetition amendment to a collective bargaining agreement. Leslie Fay cross-moves to have me set aside the award on various grounds including 1) that the amendment, which purports to extend one year beyond the expiration of the collective bargaining agreement, is extraordinary in its reach and is unenforceable because it was made out of the ordinary course of business with no notice being given as required by section 363 of the Bankruptcy Code and 2) that the award is unenforceable because the arbitrator exceeded his authority in reaching his decision.[1] The failure to give to the creditors notice and an opportunity for a hearing was deliberate; Leslie Fay refused to do so because, it says, the provisions which

it now finds offensive were withdrawn from the agreement after the Union's membership turned down those provisions in an initial vote. As additional justification Leslie Fay has shown, without contradiction from the Union, that information which was not available to Leslie Fay at the time it entered into the agreement plainly indicates that the agreement is not in the best interests of the estate. The Union counters that section 1113 of the Bankruptcy Code governs this postpetition modification of the collective bargaining agreement, overriding section 363 of the Code, and mandates that Leslie Fay abide by the terms of the modification, consistent with the determination of the arbitrator.

### I.

Leslie Fay is a publicly-held corporation which has been operating along with certain of its affiliates under chapter 11 of the Bankruptcy Code since April 5, 1993. Babcock Aff. at ¶ 7. Leslie Fay's filing was the result, at least in part, of an accounting scandal which erupted in early January, 1993, in which accusations were made that senior management had falsified financial records of the company. Suppliers, concerned that Leslie Fay's financial condition might be worse than it appeared and that they might not be paid, began refusing shipment of inventory to Leslie Fay's stores. The chapter 11 petitions followed. Following the bankruptcy filing, Leslie Fay engaged new auditors to review its historical financial statements, which task was completed in September, 1993. *Id.* at ¶ 8. As a result of the audits and the investigation, Leslie Fay adjusted its pre-tax income figures by over $80 million for 1990, 1991 and 1992 and made further pre-tax adjustments aggregating approximately $79 million. *Id.*

To understand what drives this dispute, some history of the relationship of the parties is needed. As one of the largest producers of women's dresses and sportswear in the United States, Leslie Fay, the Union con-

1. The parties have consented to my rendering a final order; thus it is not necessary to linger over the question of whether their dispute is within my core jurisdiction. Further, the parties have

agreed that the salient facts are not in dispute and that I may therefore decide these motions based on the affidavits and exhibits which were submitted.

tends, employs roughly 4,000 employees, some fifty-eight percent of whom are represented by unions. Union Motion to Confirm ("Union Motion") at ¶ 4. The Union represents all of Leslie Fay's non-supervisory production, maintenance, packing and shipping employees. *Id.* at ¶¶ 3 and 4. Leslie Fay and the Union are parties to a master collective bargaining agreement dated June 1, 1991 (the "Master Agreement") the term of which was set to and, indeed, did expire on May 31, 1994. Babcock Aff. at ¶ 3. Since 1991, Leslie Fay and the Union have negotiated some dozen or so interim supplemental agreements which in some way or another modified the Master Agreement. Thrope Repl.Aff. at ¶ 4 and Mazur Aff. at ¶¶ 5 and 9. Most of these agreements are not relevant to this dispute. Relevant are the supplemental agreement which the parties entered into in July, 1993, three months after the bankruptcy was commenced (the "Memorandum") and two supplemental agreements which the parties entered into in June and October, 1992 (the "June Modification" and "October Modification", respectively), before the bankruptcy. Thrope Repl. Aff. at ¶ 4.

Leslie Fay negotiated the Memorandum in an attempt to reverse a tide of significant losses which the company was experiencing at its union shops in Pennsylvania. Babcock Aff. at ¶ 10. These losses, company officials believed, were attributable to the labor and other production costs at Leslie Fay's Pennsylvania facility which were high relative to the costs its competitors bore using off-shore production and non-union domestic shops. Babcock Aff. at ¶ 10. As will be discussed shortly, at the time that the parties agreed to the terms of the Memorandum, Leslie Fay was not fully apprised of how deep the problems ran. Pursuant to the Memorandum, the Union agreed to:

(1) closure of three factories,

(2) consolidation of several factories,

(3) a 40-hour week to replace the historic 35-hour one,

(4) removal of work from Pennsylvania contractors,

(5) withdrawal with prejudice of several complaints in arbitration, and

(6) Leslie Fay's release from its prior commitment to expand its facilities.

Leslie Fay agreed to:

(1) maintain current employment levels for 1,000—1,200 employees at remaining facilities through May, 1995, one year beyond the expiration of the Master Agreement,

(2) expand employment at the Julie II facility, and

(3) upgrade certain manufacturing equipment.

Union Motion at ¶¶ 9–10 and Mazur Aff. at ¶ 15 (Memorandum covers 1,000–1,200 employees). The Memorandum also purported to settle numerous claims which were the subject of arbitration proceedings and which Leslie Fay estimates involved claims in the millions of dollars. Memorandum at 1 and Leslie Fay Mem. at 23. The Memorandum provides that employee ratification is a precondition for the effectiveness of the provisions concerning the 40-hour work week and the maintenance of employment levels ("ratification-dependent provisions"). In addition, the Memorandum, like the Master Agreement, mandates arbitration for the resolution of disputes between the parties. Memorandum ¶ N. As mentioned earlier, the maintenance of employment levels survives by one year the expiration of the Master Agreement. The parties were careful to provide, however, that the Memorandum was not meant to extend the life of the Master Agreement. Memorandum ¶ J.

Prior to the execution of the Memorandum, Leslie Fay's bankruptcy counsel told the Union's counsel, among other people attending a meeting of the committee of unsecured creditors (on which the Union sits), that the Memorandum required bankruptcy court approval.[2] After receiving that opinion, the parties executed the Memorandum, which makes no reference to the need for court approval.

To follow Leslie Fay's argument that the Memorandum constitutes a unique and un-

---

**2.** There is no dispute about this and the subsequent correspondence between the parties con-

firms this understanding.

precedented document entered into out of the ordinary course of business, we need to spend a few moments on the earlier June and October Modifications. In the June Modification, which did not survive the expiration of the Master Agreement, Leslie Fay agreed, among other things, to maintain certain minimum levels of employment for approximately 540 union members and to invest in an automated production system at one of its facilities in Pennsylvania. Babcock Aff. at ¶ 6. In the October Modification, which similarly did not survive the expiration of the Master Agreement, Leslie Fay agreed to provide 125 additional Union employees and pay certain liquidated damages to the Union in exchange for the Union's allowing the company to use non-union contractors for domestic production by a Leslie Fay subsidiary. *Id.*

We now return to the chronology respecting the Memorandum. On August 5, 1993, the Union membership overwhelmingly voted to reject the ratification-dependent provisions of the Memorandum. The next day, the president of the Union informed his counterpart at Leslie Fay of the "preliminary and unofficial" vote and advised him that the Union planned to hold a second vote. Appendix to Stipulation, Exh. 15. That same day, Leslie Fay, which in the meantime had received a "disturbing, more thorough and complete picture of Leslie Fay's financial condition," gave notice to the Union that it considered the ratification-dependent provisions to be ineffective but the remainder of the Memorandum to be in full force and effect. Leslie Fay Resp. at Exh. I, Babcock Aff. at ¶¶ 19 and 22. Apparently, company officials had received reports only one week after signing the Memorandum that Leslie Fay's "operating losses were much more severe than originally had been anticipated, including losses of approximately $20 million for the twenty-one week (21) period ending May 23, 1993 ... and that inventory levels

were much higher than anticipated ... and that sales orders and volume had been reduced substantially." *Id.* at ¶ 19. Based on this new information, it became apparent that Leslie Fay could not profitably manufacture apparel under the cost structure imposed by the Memorandum. Specifically, compliance with the job guarantees would result in excessive production costs which would prevent Leslie Fay from realizing a profit or, worse, breaking even on its domestic production of dresses and sportswear, and would thereby lead to losses. *Id.* Seeing an opportunity to avoid significant adverse impacts that were projected to result from the enforcement of the job guarantees, Leslie Fay decided on "August 6th that it did not want a second vote and would instead seize its unexpected opportunity to eliminate the July 15th Memorandum Agreement's ratification dependent provisions." Babcock Aff. at ¶ 26 and Union Motion, Exh. 4 at 12.

From there, the Union and Leslie Fay traded correspondence in which they argued over the effectiveness of holding a second vote. Essentially, the Union announced its plan for a second vote while Leslie Fay informed the Union that the company would "not recognize any further vote on this issue, be it self-styled as 'official' or otherwise" since the ratification-dependent provisions were not effective.[3] Babcock Aff. at ¶ 24 and Leslie Fay Resp. Exh. J.

On August 16, 1993, Leslie Fay communicated its intention to close its Julie II facility, a facility covered by the job guarantees in the Memorandum. Leslie Fay Resp. at ¶ 27 and Memorandum at ¶ B.2. In response, the Union initiated an arbitration proceeding in accordance with Article 42 of the Master Agreement, seeking, among other things, a preliminary injunction staying Leslie Fay's planned closure of the Julie II facility as violative of the job guarantees in the Memo-

---

**3.** Leslie Fay has argued repeatedly in this court that the ratification-dependent provisions were "withdrawn" by Leslie Fay with the result that the arbitrator could not consider their effectiveness. *See, e.g.,* Leslie Fay's Reply Mem. of Law at 3. The factual contention, however, is simply incorrect. In all of its correspondence, as well as in Mr. Babcock's affidavit, Leslie Fay stated that the ratification-dependent provisions were ineffective (or words to that effect), not that the provisions had been withdrawn by Leslie Fay. Since Leslie Fay consistently took the position that the provisions were ineffective, rather than that they were not part of the Memorandum, the argument that the arbitrator was powerless to consider the effectiveness of the ratification-dependent provisions necessarily falls.

randum. Leslie Fay Resp. at ¶ 29. Leslie Fay denied that the ratification-dependent provisions of the Memorandum were valid because the Union membership had failed to ratify them. Union Motion at 7–8.

Arbitrator John E. Sands conducted five days of hearings starting on October 6, 1993. On October 26, 1993, he issued an Opinion and Interim Award granting preliminary injunctive relief to the Union. He found that the ratification-dependent provisions in the Memorandum require employee ratification, but that the Memorandum fails to address the mechanism for achieving such ratification. He noted that no mention is made of a limitation to one vote or a prohibition on multiple votes. Further, the arbitrator found that ratification was *not* part of the *quid pro quo,* but instead was merely a precondition by the Union to the various concessions made by both parties. He concluded from this that Leslie Fay had no interest or say in how the Union achieved ratification, since it was purely an internal matter between the Union and its members.

On January 10, 1994, Arbitrator Sands issued his final decision and award. He concluded that the Memorandum is in full force and effect and directed that "the parties shall comply with all of its terms." Union Motion, Exh. 1 at 3. That decision expressly refrained from addressing the effect, if any, of the bankruptcy filing.

Armed with Arbitrator Sand's decision, the Union brought this motion to confirm the award. Leslie Fay now argues that the Memorandum imposes substantial burdens on Leslie Fay in the form of job guarantees for one year beyond the expiration date of the Master Agreement (through May 31, 1995) and maintenance of levels of salary for those employees for the extra year. Leslie Fay projects the added liability to the estate (and its creditors) from enforcement of the Memorandum will be in the neighborhood of $13.8 million. Thrope Repl. Aff. at 16–17.

## II.

To determine whether to confirm the arbitrator's award, I must first determine whether, as Leslie Fay contends, the Bankruptcy Code stands as an impediment to its confirmation. Only if the Code is no bar need I reach the additional issues. Subsumed in this threshold question are two others: (i) whether section 1113 of the Code governs the Memorandum with the result urged by the Union that section 363 of the Code falls by the wayside and (ii) whether Leslie Fay's postpetition entry into the Memorandum qualifies as a transaction in the "ordinary course" of business of Leslie Fay such that notice and the opportunity for a hearing were not required. As to the first of these subsidiary questions, the Union urges that section 1113 applies to all consensual modifications of collective bargaining agreements, be they entered into before or during the course of the bankruptcy case.

Beyond these bankruptcy-based issues, Leslie Fay argues that if the Code poses no bar to confirmation of the award, the award nonetheless must be vacated because the arbitrator modified the terms of the Memorandum by sanctioning multiple votes by the Union despite the one-vote contemplation by the parties (Leslie Fay Resp. at 4) or because the arbitrator exceeded his authority granted in the Master Agreement by directing Leslie Fay to comply *in futuro* with all the terms of the Memorandum.[4] As to this direction to the future conduct of Leslie Fay, the Union agrees that that constituted an error and suggests that it simply be excised from the award in the order which otherwise confirms the award.

I am not asked to and do not decide the consequences that might flow from Leslie Fay's conduct after the Union's initial ratification vote. Moreover, I have not been asked by the parties to determine and therefore do not reach the issue of whether Leslie Fay is free to close Julie II and discharge employees if the Memorandum is unenforceable. The Union's depiction of Leslie Fay's strategy as involving no risk is not correct

---

4. Leslie Fay also argues that the arbitrator exceeded his contractual authority by reinstating the ratification-dependent provisions after Leslie Fay withdrew them following the first vote. (Leslie Fay Memo. at 27–28). I have already disposed of this argument.

and, in any event, likely will be dealt with at a later time.

## III.

### A. *Collective Bargaining Agreements and 11 U.S.C. § 1113*

The Union contends that "Leslie Fay cannot invoke any other provision of the Bankruptcy Code—including Section 363—to circumvent the mandatory provisions of Section 1113 and achieve a non-consensual modification of a collective bargaining agreement." Union Post–Hearing Mem. at 3. The theory is that section 1113 governs disputes, such as the one here, concerning postpetition modifications to collective bargaining agreements. Alternatively, the Union contends that the Memorandum, which modifies a prepetition collective bargaining agreement, relates back to the Master Agreement. Thus, the argument continues, Leslie Fay's resort to section 363(b) of the Code to contest the Memorandum's enforceability is tantamount to an impermissible non-consensual modification of a prepetition collective bargaining.

"Collective bargaining agreements are simply executory contracts with a special provision governing their assumption or rejection by the debtor or the trustee in a Chapter 11 case." *In re Moline Corp.*, 144 B.R. 75, 78 (Bankr.N.D.Ill.1992). Section 1113 of the Code "controls the assumption and rejection of collective bargaining agreements in chapter 11 proceedings." *In re Maxwell Newspapers, Inc.*, 981 F.2d 85, 89 (2d Cir.1992). This "statute puts into place 'safeguards designed to insure that employers did not use Chapter 11 as a medicine to rid themselves of corporate indigestion'" by prohibiting the unilateral modification of collective bargain-

ing agreements.[5] *Id.* (quoting *Century Brass*, 795 F.2d at 272).

The Union's first contention is that section 1113 applies to all collective bargaining agreements, whether entered into before or after the commencement of the reorganization case. I do not agree. Nothing in the language of the statute or its legislative history[6] indicates that section 1113 was intended to govern disputes with respect to postpetition collective bargaining agreements. Indeed, I have been directed to and have found no case law which is supportive of that notion.

■■■ There are cases which have addressed the question of whether section 365 applies to postpetition agreements; the learning from these cases is that contracts, whether of the collective bargaining variety or not, entered into postpetition are not subject to rejection under section 365. *See In re Airport Executive Center, Ltd.*, 138 B.R. 628, 629 (Bankr.M.D.Fla.1992) (debtor can not reject a postpetition lease); *In re Schuld Manufacturing Co., Inc.*, 43 B.R. 535, 537 (Bankr.W.D.Wis.1984) (trustee not permitted to reject a postpetition collective bargaining agreement); *In re IML Freight, Inc.*, 37 B.R. 556, 559 (Bankr.D.Utah 1984) (same); *accord In re TS Industries, Inc.*, 117 B.R. 682, 685 (Bankr.D.Utah 1990). Admittedly, the collective bargaining cases just cited were decided before the enactment of section 1113. But their reasoning is sound today unless it can be said that in enacting section 1113 Congress meant it to apply to a broader spectrum of contracts than did section 365. There is, however, absolutely no indication that Congress intended to expand the universe of contracts to which the law of assumption and rejection, previously expressed

---

5. Congress enacted § 1113 in response to the Supreme Court's holding in *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984), in which the Court determined that postpetition unilateral rejection of the labor contract by the employer was not an unfair labor practice. As a consequence, a debtor could unilaterally terminate a collective bargaining agreement or alter its provisions prior to seeking court approval for its rejection pursuant to § 365(a). *In Re Century Brass Products, Inc.*, 795 F.2d 265, 272 (2d Cir.1986), *cert. denied*, 479 U.S. 949, 107 S.Ct. 433, 93 L.Ed.2d 383 (1986).

6. The legislative history of section 1113 is scant, consisting of little more than self-serving statements by opposing partisans. No committee reports were issued on the statute. *In re Mile Hi Metal Systems, Inc.*, 899 F.2d 887, 890 (10th Cir.1990) (citing, *In re Royal Composing Room*, 848 F.2d 345, 352–354 (2d Cir.1988), *cert. denied*, 489 U.S. 1078, 109 S.Ct. 1529, 103 L.Ed.2d 834 (1989) and *In re Carey Transportation, Inc.*, 50 B.R. 203, 206 (Bankr.S.D.N.Y.1985), *aff'd*, 816 F.2d 82 (2d Cir.1987)).

in section 365 alone, applies. As one commentator has noted:

> As a matter of logic, if section 365(a) applies exclusively to prepetition contracts and section 1113 simply establishes special treatment for one type of executory contract, a collective bargaining agreement, section 1113 should apply only to prepetition collective bargaining agreements absent specific language to the contrary.

3 J. Queenan, P. Hendel and I. Hillinger, *Chapter 11 Theory and Practice*, § 19.26 at 19:85 (1994). The treatise's conclusion, that section 1113 has no applicability to a collective bargaining agreement entered into postpetition, is persuasive. Thus, if I construe the Memorandum as a postpetition contract, section 1113 would be inapplicable.

▇▇▇ Whereas the Union initially categorized the Memorandum as a postpetition agreement, it later backpedaled somewhat, describing the Memorandum as a postpetition agreement which relates back to and thereby becomes part of a prepetition contract which is embraced by section 1113.[7] It is not necessary, however, to determine whether the Memorandum is tantamount to a new collective bargaining agreement unless the Memorandum is an ordinary course agreement. For as the Third Circuit determined in *In re Roth American, Inc.*, 975 F.2d 949, 952 (3d Cir.1992), and as I will discuss below, a postpetition modification to a collective bargaining agreement, if out of the ordinary course of business, is not enforceable absent compliance with section 363(b). *Cf. In re Ionosphere Clubs, Inc.*, 100 B.R. 670, 671 (Bankr.S.D.N.Y.1989) (not in the labor context) (where an amended agreement is materially different from the original prepetition document, it is not simply assumable

pursuant to section 365 but is subject to the requirements of section 363).

B. *The Claimed Incompatibility of Sections 1113(f) and 363(b)*

In the Union's view, application of section 363(b) to postpetition modifications of collective bargaining agreements is at war with section 1113(f), which states:

> No provision of this title shall be construed to permit a trustee to unilaterally terminate or alter any provisions of a collective bargaining agreement prior to compliance with the provisions of this section.

Section 363(c)(1) of the Code permits a debtor in possession to enter into transactions involving property of the estate in the ordinary course of the debtor's business without first seeking court approval. 11 U.S.C. 363(c)(1). Where the transaction is outside the ordinary course of the debtor's business, on the other hand, the Code prohibits the debtor from using, selling or leasing property of the estate until the creditors and other parties in interest are given notice of the proposed transaction and the opportunity for a hearing if they object to the proposal. 11 U.S.C. § 363(b)(1). If an objection is interposed, then the dispute requires judicial resolution. These provisions were "designed to allow a trustee (or debtor-in-possession) the flexibility to engage in ordinary transactions without unnecessary oversight, while protecting creditors by giving them an opportunity to be heard when transactions are not ordinary." *Roth American*, 975 F.2d at 952 (citing *United States ex rel. Harrison v. Estate of Deutscher*, 115 B.R. 592, 599 (M.D.Tenn. 1990) (quotation omitted)); *see In re Johns–Manville Corp.*, 60 B.R. 612, 616 (Bankr.

---

7. The parties have expended some effort in arguing over whether the Memorandum is severable from the Master Agreement. If it is severable, then it is effectively a new agreement, and section 1113 should not apply at all. If it is not severable, then, the Union argues, the Memorandum becomes part of the prepetition agreement and is subject to section 1113. As the text of this decision indicates, I believe the Union puts the cart before the horse, by assuming that a modification which is outside the ordinary course of business becomes a part of the prepetition collective bargaining agreement. In any event, it seems fairly obvious that the Memorandum is severable from the Master Agreement. The Memorandum extends beyond the life of the Master Agreement and covers issues not part of the Master Agreement, declares that it is not reopening the Master Agreement and is supported by independent consideration. *See Byrd v. Gardinier, Inc.*, 831 F.2d 974 (11th Cir.1987), *cert. denied*, 488 U.S. 853 (1988); *In re Royster Co.*, 137 B.R. 530, 532 (Bankr.M.D.Fla.1992) (court concluded that riders to certain prepetition agreements were separate contracts because there was separate and distinct consideration and performance under each rider was enforceable on its own).

S.D.N.Y.1986); *In re James A Phillips, Inc.,* 29 B.R. 391, 394 (S.D.N.Y.1983) ("[T]he apparent purpose of requiring notice only where the use of property is extraordinary is to assure interested persons of an opportunity to be heard concerning transactions different from those that might be expected to take place so long as the debtor in possession is allowed to continue normal business operations under 11 U.S.C. § 1107(a) and § 1108").

In *Roth American,* the debtor and the union were parties to a postpetition agreement which, like the Memorandum, modified the prepetition collective bargaining agreement and contained a guarantee on the part of the debtor to maintain production levels for two years in exchange for certain wage concessions. Even though the case was decided years after Congress had enacted section 1113 and even though the court made reference to section 1113(f), 975 F.2d at 955, the Third Circuit analyzed the postpetition agreement under section 363(b)(1), and determined that the modification was not an ordinary course transaction pursuant to section 363(c)(1) of the Bankruptcy Code because it contained the debtor's guarantee to maintain employment for a two-year period. 975 F.2d at 954. The Third Circuit noted that section 549 of the Code permitted the avoidance of any transfer which was not authorized by the Code and from this extrapolated that the postpetition extraordinary modification was not enforceable against the estate. *Id.* at 952, n. 3 and 954.

■ I am unpersuaded by the Union's contention that the analysis in *Roth American* is faulty and that sections 1113(f) and 363(b) are irreconcilable. The Second Circuit's framework for analyzing the interplay of section 1113(f) and other sections of the Code leads me to conclude that section 1113(f) does not negate the need for notice and a hearing where a proposed postpetition modification to a collective bargaining agreement is outside of the ordinary course of a debtor's business. *See, e.g., In re Ionosphere Clubs, Inc.,* 22 F.3d 403 (2d Cir.1994) ("*Ionosphere II*"); *In re Ionosphere Clubs, Inc.,* 922 F.2d 984 (2d Cir.1990) ("*Ionosphere I*").

*cert. denied,* —— U.S. ——, 112 S.Ct. 50, 116 L.Ed.2d 28 (1991).

In *Ionosphere I,* the Second Circuit discussed the relationship of section 1113(f) to sections 362 and 105(a), stating that:

[s]ection 1113(f) is circumstance specific rather than section specific. Congress did not choose to direct § 1113(f) at any specific provision whose application it deemed would always permit a debtor unilaterally to alter a collective bargaining agreement. Rather, § 1113(f) presumes a particularized determination in any circumstance as to whether the application of another provision of the Bankruptcy Code will permit a debtor unilaterally to terminate or alter a collective bargaining agreement.

922 F.2d at 991. In the context of section 362, the Circuit concluded that "a bright line rule precluding the application of the automatic stay to any situation involving a collective bargaining agreement was not intended by Congress." *Id.* The Circuit adopted a case-by-case test which gives effect to section 362 "to the extent that its application is not in irreconcilable conflict with § 1113." *Id.* The Circuit held that sections 362 and 1113 are in conflict to the extent that the automatic stay would otherwise prevent the commencement of arbitration proceedings provided for by the collective bargaining agreement. On the other hand, for a dispute between the parties which was not arbitrable, the Circuit said that the automatic stay was operative and that the dispute could be litigated in the bankruptcy court since that did not offend any provision of the collective bargaining agreement. Similarly, the Circuit concluded that "the bankruptcy court's exercise of its equitable powers pursuant to § 105 to enjoin enforcement of a collective bargaining agreement is subject to the same considerations set forth ... for the application of § 362." *Id.* at 995.

In *Ionosphere II,* the Circuit reaffirmed its case-by-case approach, and held that section 1113 was not irreconcilable with and thus did not supersede section 507, governing the priority of claims. 22 F.3d at 407.[8] In so

---

8. Courts have split on the issue of whether the failure to pay postpetition wages and benefits

constitutes a breach rather than an impermissible alteration of a collective bargaining agree-

holding, the Circuit noted, "[i]n enacting section 1113, Congress was concerned with preventing employers from using bankruptcy as an offensive weapon to rid themselves of burdensome collective bargaining agreements, not with re-ordering the priority in which claims would be paid." In both *Ionosphere* decisions the Second Circuit recognized that where "two statutes are capable of co-existence, it is the duty of courts ... to regard each as effective." *Ionosphere II*, 22 F.3d at 407; *Ionosphere I*, 922 F.2d at 991 (quoting *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 155, 96 S.Ct. 1989, 1993–94, 48 L.Ed.2d 540 (1976)) (internal citation omitted); *see Armstrong Store*, 135 B.R. at 22.

Section 1113 governs the assumption and rejection of collective bargaining agreements and it forbids the debtor from unilaterally terminating or altering the collective bargaining agreement. The focus of the statute is to force the parties to negotiate. *See In re Maxwell Newspapers, Inc.*, 981 F.2d at 89. But whereas the statute commands negotiation it does not state that any modification to which the parties may agree may be implemented and become enforceable notwithstanding section 363(b)(1). In fact, the statute does not address consensual modifications at all.

 I agree with the Union that, as a general rule, a debtor whose employees are covered by a collective bargaining agreement is permitted to enter into a new collective bargaining agreement or a modification to an existing agreement postpetition without notice and a hearing. *See, e.g., In re Illinois–California Express, Inc.*, 72 B.R. 987 (D.Colo.1987); *In re DeLuca Distributing Co.*, 38 B.R. 588 (Bankr.N.D.Ohio 1984). However, I have found no authority which suggests as the Union implies that a debtor has the unfettered prerogative to enter into any postpetition transaction solely because it is contained in a collective bargaining agreement. *Roth American* in fact instructs us otherwise. If the scope of the agreement is consonant with its predecessors and does not

offend any fundamental bankruptcy policy, the debtor does not need to provide notice and a hearing. On the other hand, if the debtor were to agree to do something extraordinary, such as giving the union a lien on the debtor's property, or to do an act which is inimical to the theory and philosophy of the Code, such as the payment of prepetition indebtedness, then, as *Roth American* has determined, pursuant to section 363(b)(1) the agreement is not enforceable absent notice and a hearing. *See Johns–Manville*, 60 B.R. at 617–18. Nothing in this holding offends the letter or spirit of section 1113. Requiring a debtor to give its creditor body the opportunity to be heard on a proposed extraordinary modification to a collective bargaining agreement will not cause the debtor to unilaterally alter or terminate its existing labor agreement. The two statutory sections are fairly easily harmonized consistent with the aims of section 1113 and the protection of creditors which is inherent in the chapter 11 process. *See Bank of America N.T. & S.A. v. World of English, N.V.*, 23 B.R. 1015, 1022 (N.D.Ga. 1982); *accord In re Kleinman*, 136 B.R. 74 (Bankr.S.D.N.Y.1992); *In re Mancini*, 1986 WL 28905, *6 (Bankr.S.D.N.Y. March 26, 1986); *In re CLE Corp.*, 59 B.R. 579, 584 (Bankr.N.D.Ga.1986). A contrary holding, that section 363(b)(1) is inapplicable to an extraordinary consensual postpetition modification of a collective bargaining agreement, would radically alter the statutory scheme, undercutting the participation of creditors and greatly strengthening the hands of debtors in possession, with no concomitant gain furthering any Congressionally-expressed labor policy.

Moreover, had Congress intended to alter the notice and a hearing requirement in section 363(b) to preclude its application to a postpetition agreement with a union, it would have done so explicitly. *Cf. Ionosphere I*, 922 F.2d at 991. Thus, I hold that section 1113 does not obviate the mandate that the debtor offer notice and a hearing where a postpetition modification to a collective bar-

---

ment. *See In re Alabama Symphony Ass'n*, 155 B.R. 556, 571 n. 34 (Bankr.N.D.Ala.1993) (contrasting *Moline*, 144 B.R. at 79 (not an alteration) with *In re Armstrong Store Fixtures Corp.*,

135 B.R. 18, 21 (Bankr.W.D.Pa.1992), *recons. denied*, 139 B.R. 347 (Bankr.W.D.Pa.1992) (impermissible alteration)).

gaining agreement is outside the ordinary course of a debtor's business.

### C. *The Nature of the Memorandum Under 11 U.S.C. § 363*

The only issue remaining is whether the Memorandum constituted an ordinary course agreement and is therefore enforceable.

The Bankruptcy Code does not define the term "ordinary course." Nor is legislative history any more elucidating. *Roth American,* 975 F.2d at 952. Where disputes arise as to a transaction's "ordinariness," courts typically apply two tests: the industry-wide test, sometimes called the "horizontal test," and the creditor's expectation test, sometimes called the "vertical test." *Johns–Manville,* 60 B.R. at 616–19; *In re Waterfront Companies.,* 56 B.R. 31, 34–5 (Bankr.D.Minn.1985); *see also In re Dant & Russell, Inc.,* 853 F.2d 700, 704–06 (9th Cir. 1988); *Habinger, Inc. v. Metro. Cosmetic & Reconstructive Surgical Clinic,* 124 B.R. 784, 786 (D.Minn.1990); *In re Glosser Brothers, Inc.,* 124 B.R. 664, 667–68 (Bankr.W.D.Pa. 1991). The horizontal test focuses on "whether, from an industry-wide perspective, the transaction is the sort commonly undertaken by companies in that industry." *Roth American,* 975 F.2d at 953 (citations omitted); *Johns–Manville,* 60 B.R. at 618 ("[T]he primary focus of the horizontal analysis is external—this business vis-a-vis similar businesses."). Under the vertical test, the inquiry is whether the transaction in question subjects a hypothetical creditor to economic risks of a nature different from those he accepted when he decided to extend credit. *Roth American,* 975 F.2d at 953 (citations omitted); *Johns–Manville,* 60 B.R. at 616. In making this determination, courts look to the debtor's prepetition business practices and conduct and compare them to its course of conduct postpetition. *Id.* at 617 (citing *DeLuca Distributing,* 38 B.R. 588). The Code is not meant to straitjacket the debtor and prevent it from responding quickly to normal business demands; neither, however, is the Code meant to allow the debtor the same freedom it had when it got into finan-

cial trouble in the first place. For with bankruptcy come certain obligations to creditors, including affording creditors the right to be heard when the debtor proposes to do something beyond the ordinary.

When viewed in the context of the horizontal and vertical tests, it is clear that the Memorandum, which, among other things, purports to settle significant prepetition claims of the Union, falls outside of the ordinary course of the debtor's business. That is not to say that the Memorandum fails the horizontal test; on the contrary, "[m]any manufacturing companies have routinely entered into extensions of collective bargaining agreements in order to secure the continued benefits of a unionized workforce." *Roth American,* 975 F.2d at 952 (citing *Illinois–California Express,* 72 B.R. at 991); *DeLuca Distributing,* 38 B.R. at 594; *In re IML Freight, Inc.,* 37 B.R. 556, 559 (Bankr.D.Utah 1984). The problem lies in the fact that the Memorandum, to quote the Third Circuit Court of Appeals, "ventures beyond the domain of transactions that a hypothetical creditor would reasonably expect to be undertaken in the circumstances," *See, e.g., Roth American,* 975 F.2d at 954.

.The Memorandum is fundamentally different from any prior agreement modifying the Master Agreement in that the Memorandum both contains terms different from and whose magnitude greatly exceed any similar agreement into which the parties previously entered. This is the first time that Leslie Fay has made an agreement whose substantial concessions survive the expiration of the collective bargaining agreement. Moreover, notwithstanding that the parties had once previously agreed to job guarantees, closure of certain facilities, and a requirement of additional employees, in those instances the numbers were significantly smaller.[9] *See Waterfront,* 56 B.R. at 35 ("Some transactions either by their size, nature or both are not within the day-to-day operations of a business and are therefore extraordinary."); *accord In re Baker,* 118 B.R. 24, 29 (Bankr. S.D.N.Y.1990) (*citing Waterfront* ). The ex-

---

**9.** It bears mentioning that the June and October Modifications were also based on erroneous financial information which caused Leslie Fay to make unwise choices. Babcock Aff. at ¶ 20.

tensive job guarantees in the Memorandum are also extraordinary, notwithstanding a similar provision in the June Modification, since regular collective bargaining agreements do not normally address such matters and here the collective bargaining agreements over the forty-year course of the parties' negotiations did not regularly contain such provisions. *See Roth American,* 975 F.2d at 954 (citing *J.I. Case Co. v. NLRB,* 321 U.S. 332, 334–35, 64 S.Ct. 576, 578–79, 88 L.Ed. 762 (1944)). Were such agreements permitted as ordinary course, a debtor effectively could predetermine, without notice to anyone, the type of plan which could be implemented. For example, the debtor could prevent the disposition of a business or division because the cost of breaching the job guarantees granted to the employees would outweigh any benefit otherwise to be derived from the disposition. Also extraordinary in the Memorandum is the settlement of all arbitration claims. Thus, the Memorandum fails the vertical test and is unenforceable. *Roth American,* 975 F.2d at 954.

■ There is another, related point. Compromises may not be made in bankruptcy absent notice and a hearing and a court order. *See* Fed.R.Bankr.P. 9019(a); *cf. Continental Airlines, Inc. v. Air Line Pilots Association (In re Continental Airlines Corp.),* 907 F.2d 1500 (5th Cir.1990) (circuit court exploring whether bankruptcy judge had power to revoke previously-approved settlement with union, with second approval of settlement conditioned on modifications to agreement not necessary to protect the estate and its creditors). The Memorandum purported to settle significant disputes between the Union and Leslie Fay without notice to anyone. Thus, for this reason, too, the Memorandum is unenforceable.

### IV.

Because I have concluded that the Memorandum was not an ordinary course agreement and is unenforceable, it is not necessary to consider whether the arbitrator exceeded the scope of his authority. The Union's motion to confirm the arbitration award is denied and Leslie Fay's cross-motion to vacate the award is granted. SETTLE ORDER consistent with this decision.