In re NORTH AMERICAN ROYAL-TIES, INC., Wheland Holding Company, Inc., Wheland Manufacturing Company, Inc., and Wheland Foundry, LLC, Debtors.

No. 01–17271.

United States Bankruptcy Court,
E.D. Tennessee,
Southern Division.

April 29, 2002.

Richard C. Kennedy, Kennedy, Koontz & Farinash, Chattanooga, TN, Neal Batson, Matthew W. Levin, Jason H. Watson, Alston & Bird, LLP, Atlanta, GA, for Debtors.

Thomas E. Ray. Wooden, Ray, Fulton & Scarborough, Chattanooga, TN, Marc E. Richards, Blank, Rome, Comasky & McCauley, LLP, New York City, William Burnett, Blank, Rome, Comasky & McCauley, LLP, Wilmington, DE, for Committee of Unsecured Creditors.

### *MEMORANDUM*

R. THOMAS STINNETT, Bankruptcy Judge.

The court must decide whether to grant a motion filed by the debtor, North American Royalties (NAR), for approval of a consensual termination agreement with the United Steel Workers Association (the union). The motion is opposed by three disabled workers, Silas Passmore, Thaddeus Passmore, and Franklin H. Davis, Jr., appearing pro se. For convenience, the court will refer to them as the objectors. Their objection relates primarily to a pension plan enhancement that is part of the termination agreement.

The motion seeks to terminate a collective bargaining agreement between NAR and the union and replace it with the ter-mination agreement. In support of this relief, the motion states:

2. On November 7, 2001 (the "Petition Date"), NAR filed with this Court its voluntary petition for relief under Chapter 11 of the Bankruptcy Code. Pursuant to Section 1107 and 1108 of the Bankruptcy Code, NAR continues to operate its businesses and manage its property as debtor in possession. NAR's case is being jointly administered with the related cases filed by certain direct and indirect subsidiaries.

3. On or about November 16, 2001, the United States Trustee appointed the Official Committee of Unsecured Creditors (the "Committee") in the above-captioned cases. No trustee or examiner has been appointed in these cases.

4. Prior to the Petition Date, NAR operated a foundry operations that supplied, at one time, certain parts used in over one-half of the vehicles produced in the United States. NAR operated its foundry business from two locations, Chattanooga, Tennessee and Warrenton, Georgia. NAR's foundry operations in Chattanooga consisted of five (5) adjacent plants .... (collectively known as the "Chattanooga Plants"). In addition to the Chattanooga Plants, NAR operated a plant (the "Warrenton Plant") in Warrenton, Georgia.

5. Since the Petition Date, NAR has worked with their customers to effectuate an orderly wind down of their businesses with the least amount of interruption and damage to their customers. As of the date of this Motion, NAR has sold the Centrifuse Plant and has ceased operations at all the remaining plants. In addition, NAR has terminated employment of all but approximately thirty (30) of its employees.

6. On or about April 7, 2001, NAR entered into ... a collective bargaining

agreement (the "CBA") with the United Steelworkers ... on behalf of Local 3967 (the "Union"). The CBA governs operations at NAR's Chattanooga Plants. [footnote omitted]

. . . .

9. As noted above, NAR has sold the Centrifuse Plant and has ceased operations at the other Chattanooga Plants. Prior to ceasing production, in accordance with Section 1113 [of the bankruptcy code], NAR began negotiations with the Union relative to terminating the CBA. Debtors have reached an agreed upon resolution with the Union relative to terminating the CBA.

10. The negotiated resolution ... is memorialized in a termination agreement (the "Contract Termination Agreement"), a copy of which is attached. . . . Pursuant to the Contract Termination Agreement, the parties agreed to, among other things, the following:

(i) The CBA will be terminated effective March 31, 2002. In addition, the Contract Termination Agreement supercedes the CBA in all respects.

(ii) NAR agrees to continue to offer and provide, in accordance with the terms and conditions of the Group Insurance Protection for Hourly Employees ("Group Insurance Plan") retiree medical and life insurance until April 30, 2002.

(iii) NAR agrees to make available to each employee who is a participant in the Pension Plan Between the Wheland Foundry Division ... and United Steel Workers of America ... whose position is eliminated as a result of the shutdown of the facility, and whose employment terminates as a result of the shutdown, an enhanced supplemental benefit from the Pension Plan calculated in accordance with the exhibit attached to the Contract Termination Agreement.

11. NAR has complied with all of the requirements of Section 1113 and has, in fact, reached an agreement with the Union as memorialized in the Contract Termination Agreement. By this motion, NAR requests that the Court approve the Contract Termination Agreement pursuant to Sections 105 and 1113 of the Bankruptcy Code.

12. Notice of the Motion has been given to (i) counsel for the Committee, (ii) counsel for the Agent for the Lenders, (iii) all entities that requested notice in these cases pursuant to Rule 2002, and (iv) the authorized representatives for the CBA. NAR submits that, given the nature of the relief requested, no other or further notice of the relief requested is necessary.

The pension plan enhancement is mentioned in paragraph 10. It makes more employees eligible for a pension by reducing the eligibility requirements as to age and years of employment. NAR's counsel indicated that the pension plan must be changed because there are excess funds that must be used for pensions.

The pension plan enhancement applies only to employees who were "actively employed" in the year 2001. It provides that the "benefit and eligibility enhancements apply to hourly participants who were actively employed on or after 11/07/01." It also provides that "[s]urplus funds will be distributed to participants who were actively employed on or after 05/01/01." The pension plan enhancement defines "actively employed" as "any employee who has worked one (1) hour or more or would have worked one (1) hour or more except for an approved medical, military or family leave."

The objectors are not eligible for pensions under the current plan, but they may meet the lower requirements as to age and years of employment in the pension plan enhancement. They are not eligible under the enhancement, however, because the definition of "actively employed" excludes them. They argue that it unfairly discriminates against them as disabled employees. The thrust of their argument is that the union should have made a deal that was better for them.

The objectors have taken their dispute with the union to the federal district court. After NAR filed its motion to approve the termination agreement, the objectors filed a complaint in federal district court against both the union and one of the debtors, Wheland Foundry. The complaint relates to the pension plan enhancement and perhaps other disputes. It alleges that the union failed to fairly represent the objectors' interests and that Wheland Foundry breached the collective bargaining agreement.

NAR, as "debtor in possession," has most of the powers of a bankruptcy trustee. 11 U.S.C. §§ 1107 & 1108. This includes the power to assume or reject an executory contract. Section 365 of the bankruptcy code deals with assumption or rejection of executory contracts. 11 U.S.C. § 365; Fed.R.Bankr.P. 6006. Section 1113 provides, however, that a debtor in possession can assume or reject a collective bargaining agreement only in accordance with § 1113. 11 U.S.C. § 1113(a).

Section 1113 sets up a procedure that requires the debtor in possession to negotiate with the employees' representative before the court can grant a motion to reject the collective bargaining agreement. 11 U.S.C. § 1113(b). For convenience, the court will refer to the employees' representative as the union and to the debtor in possession as the debtor.

The debtor must make a proposal to the union. The proposal must (1) be based on the most complete and reliable information available at the time; (2) provide for necessary modifications in employee benefits and protections that are necessary to permit reorganization; (3) assure fair and equitable treatment of the debtor, the creditors, and all other affected parties. 11 U.S.C. § 1113(b)(1)(A). The debtor in possession must also provide the union with the information that is necessary to evaluate the proposal. 11 U.S.C. § 1113(b)(1)(B). After making the proposal, the debtor must meet with the union at reasonable times and confer in good faith in an attempt to reach mutually satisfactory modifications of the collective bargaining agreement. 11 U.S.C. § 1113(b)(2).

■ The court may grant a motion by the debtor to reject the collective bargaining agreement only if this negotiation process has failed. The court must find: (1) the debtor made a proposal that met the requirements of § 1113(b)(1); (2) the union refused to accept the proposal without good cause; (3) the balance of the equities clearly favors rejection. 11 U.S.C. § 1113(c).

Section 1113 fails to explain the court's role when the union and the debtor have reached an agreement. The objectors argue, in effect, that the court is required to find that the termination agreement makes only necessary modifications and is fair and equitable to all affected parties.

■ An argument can be made that the motion to approve the termination agreement should be treated as a motion to reject the collective bargaining agreement. If this is correct, the court must apply § 1113's standards for allowing rejection. The court disagrees for several reasons.

First, the court fails to see a valid and workable distinction based on whether the

new agreement only provides for modifications or replaces the collective bargaining agreement. Second, the court doubts that a request to approve the new agreement should be treated as a motion to reject the old agreement. The termination agreement is essentially a new contract made during the bankruptcy case. *See, City of Covington v. Covington Landing Limited Partnership*, 71 F.3d 1221 (6th Cir.1995); *Biggs, Inc. v. Glosser Bros., Inc., (In re Glosser Bros., Inc.)*, 124 B.R. 664 (Bankr. W.D.Pa.1991). Third, for the reasons explained below, § 1113's standards for allowing rejection do not apply to an agreement between the union and the chapter 11 debtor.

Suppose the debtor and the union undertake negotiation as required by § 1113. The union accepts a proposal by the debtor. The proposal makes so many changes that it can be characterized as a new contract. The debtor makes a motion for approval of the agreement. Dissenting union members contend the motion is really a motion to reject the collective bargaining agreement. If this is correct, then the court can approve the new contract only if the debtor is entitled to reject the old contract under § 1113. 11 U.S.C. § 1113(a). The debtor would be required to prove that it made a different proposal that met the requirements of § 1113, but the union rejected the proposal without good cause. 11 U.S.C. § 1113(c). In other words, the debtor would be required to argue against its own final agreement with the union; the debtor would have to prove that the union should have made a different deal with the debtor, but the union rejected the other deal without good cause.

This result does not make sense. Section 1113 expressly deals with the procedure and the standards for rejection of a collective bargaining agreement. It makes no provision for approval or disapproval of an agreement between the debtor and the union. The lack of such a provision in § 1113 makes one point clear: § 1113 does not require the court to apply to an agreement the same standards it must apply when deciding whether to allow rejection.

In this regard, § 1113 is essentially like § 1114 of the bankruptcy code. 11 U.S.C. § 1114. Section 1114 sets up a procedure for involuntary modification of retiree benefits by the court. The procedure is essentially the same as the procedure set by § 1113 for rejection of a collective bargaining agreement. 11 U.S.C. § 1114(e), (f), (g). Section 1114(e), however, relates to the court's duty when the debtor and the retirees reach an agreement. It provides that retiree benefits must be paid on time and cannot be modified, with two exceptions. The court can modify the benefits according to the procedure set out in the statute, or the parties can modify the benefits by agreement, "after which such benefits as modified shall continue to be paid by the trustee." 11 U.S.C. § 1114(e). This could mean that no court review is required for an agreement to take effect. At the least, it means the court need not approve an agreement under the standards in § 1114 that apply to modification by the court. That kind of review is required only for modification by the court *after* negotiations have failed. Section 1113 works the same way even though it does not include a provision equivalent to § 1114(e).

The supreme court's decision in the *Bildisco* case also suggests a more limited role for the court with regard to an agreement by the union and the debtor. *National Labor Relations Board v. Bildisco and Bildisco*, 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984). *Bildisco* preceded the enactment of § 1113. 9C Am.Jur.2d *Bankruptcy* § 2234. Nevertheless, the supreme court's reasoning is still relevant

with regard to the court's role in dealing with an agreement because § 1113 fails to deal with the problem. The supreme court said:

> Before acting on a petition to modify or reject a collective-bargaining agreement, however, the Bankruptcy Court should be persuaded that reasonable efforts to negotiate a voluntary modification have been made and are not likely to produce a prompt and satisfactory solution. The NLRA requires no less. Not only is the debtor-in-possession under a duty to bargain with the union, [citation omitted], but the national labor policies of avoiding labor strife and encouraging collective bargaining, [citation omitted], generally require that employers and unions reach their own agreements on terms and conditions of employment free from governmental interference. [citations omitted] The Bankruptcy Court need step into this process only if the parties' inability to reach an agreement threatens to impede the success of the debtor's reorganization. If the parties are unable to agree, a decision on the rejection of the collective-bargaining agreement may become necessary to the reorganization process. At such a point, action by the Bankruptcy Court is required, while the policies of the Labor Act have been adequately served, since reasonable efforts to reach agreement have been made. That court need not determine that the parties have bargained to impasse or make any other determination outside its area of expertise.

*Bildisco,* 104 S.Ct. 1188, 1196–1197.

The supreme court went on to explain that the bankruptcy court's decision on whether to allow rejection should focus on how it will affect the debtor's reorganization:

> The Bankruptcy Court is a court of equity, and in making this determination it is ... balancing the equities.... Nevertheless, the Bankruptcy Court must focus on the ultimate goal of Chapter 11 when considering these equities. The Bankruptcy Code does not authorize free-wheeling consideration of every possible equity, but rather only how the equities relate to the success of the reorganization.

*Bildisco,* 104 S.Ct. 1188, 1197.

In these passages the supreme court warned that the bankruptcy court, when deciding whether to allow rejection, should keep within its area of expertise; it should focus on the relationship of the equities to the reorganization process. Certainly, then, the supreme court did not intend for the bankruptcy court to engage in a broader inquiry when deciding whether to approve an agreement between the union and the debtor. In particular, the bankruptcy court should not be called upon to consider the equities from the viewpoint of labor law.

The supreme court made the point again when it took up the union's argument that the bankruptcy court should allow rejection only if the union and the debtor had bargained to impasse. The supreme court treated this requirement as equivalent to the rule in labor law as to when an employer can be excused from its duty to negotiate. The supreme court declined to require the bankruptcy court to find, as a prerequisite to rejection, that the parties had bargained to impasse. The supreme court declined because the requirement would "divert the Bankruptcy Court from its customary area of expertise into a field in which it presumably has little or none." *Bildisco,* 104 S.Ct. 1188, 1200.

In summary, *Bildisco* strongly suggests that the bankruptcy court should have a limited role in deciding whether to approve

an agreement between the debtor and the union to modify, replace, or terminate a collective bargaining agreement. In particular, the bankruptcy court is not called upon to apply the same standards it would apply when deciding whether to allow rejection. *In re Leslie Fay Companies, Inc.,* 168 B.R. 294, 303 (Bankr.S.D.N.Y.1994).

An argument can be made that no review of any kind is required because § 1113 does not require it. But the absence of such a requirement from § 1113 leaves open the possibility that court approval is required by other provisions of the bankruptcy code.

Section 365 deals generally with assumption and rejection of executory contracts. If the court treated the agreement as a rejection, an assumption, or a combination of the two, § 365 still would not apply, because § 1113 provides that it controls assumption or rejection of a collective bargaining agreement. Thus, § 365 cannot require court approval. 11 U.S.C. §§ 365 & 1113(a).

Furthermore, the court has already expressed its doubt about treating an agreement as an assumption, a rejection, or a combination of the two. An agreement between the union and the chapter 11 debtor is essentially a new contract. As a result, § 363 may require court approval. It requires court approval when the debtor proposes to use property of the bankruptcy estate out of the ordinary course of business. 11 U.S.C. § 363(b).

The court assumes, for the purpose of discussion, that the agreement deals with property of the bankruptcy estate. Changing or replacing a collective bargaining agreement may or may not be in the ordinary course of business. *Compare: In re Roth American, Inc.,* 975 F.2d 949 (3d Cir.1992); *In re Leslie Fay Companies, Inc.,* 168 B.R. 294 (Bankr.S.D.N.Y.1994); *with: Illinois–California Express, Inc. v.*

*Teamsters National Freight Industry Negotiating Committee (In re Illinois–California Express, Inc.),* 72 B.R. 987 (D.Colo. 1987); *In re DeLuca Distributing Co.,* 38 B.R. 588 (Bankr.N.D.Ohio 1984).

The court concludes this termination agreement is out of the ordinary course of business for NAR. It ends a long-lasting contractual relationship between the union and NAR because NAR is totally shutting down its business. Similar events may occur regularly in industries of all kinds, but that does not mean they are in the ordinary course of business. Indeed, few things are more out of the ordinary than the end of an old, established business, the lay-off of all its employees, and the resulting end of the contractual relationship between the business and the employees' union.

The court can approve a transaction outside the ordinary course of business if the debtor proves that it is justified by a sound business purpose. *Stephens Industries, Inc. v. McClung,* 789 F.2d 386 (6th Cir.1986); *In re New Era Resorts, LLC,* 238 B.R. 381 (Bankr.E.D.Tenn.1999). NAR has shown a sound business purpose for the changes in the pension plan. NAR is ceasing business. It has no need for a collective bargaining agreement. It will cease to incur and pay all continuing business expenses. The union recognized this and agreed to termination of the current agreement. The termination will not adversely affect the bankruptcy case by adding claims or reducing the assets available to pay claims. It is neutral in that regard since this is a liquidating chapter 11 case.

As to the pension plan enhancement, the court fails to see how it can harm NAR's bankruptcy estate or the creditors. The enhancement does not take away from the objectors any thing they already have. The enhancement takes the necessary step of providing for the use of excess pension funds. It does so by expanding eligibility

for a pension. The court certainly cannot say that the particular terms of the expansion are unacceptable. A decision as to whether there is a sound business reason for the changes made by the enhancement should not involve a decision on whether the union could have made a better or different deal for the employees. That is a labor law problem to be worked out between the union and the employees. The objectors' other objections also fall into this category. They do not raise bankruptcy issues that this court must deal with. As the court pointed out earlier, the objectors have already filed a lawsuit in district court to challenge the union's actions.

The court will enter an order approving the termination. The termination agreement calls for termination as of April 30, 2002, and NAR needs immediate termination in order to avoid added liabilities. Therefore, the court will make the order effectively immediately under Fed. R.Bankr.P. 6004(g).

This Memorandum constitutes findings of fact and conclusions of law as required by *Fed.R.Bankr.P.* 7052.